James L. SHORES, Jr., as Executor of
the Estate of Clarence E. Bishop, Jr.,
etc., et al., Plaintiffs-Appellants,

v.

Jerald H. SKLAR et al.,
Defendants-Appellees.

No. 77–2896.

United States Court of Appeals,
Fifth Circuit.

May 26, 1981.

Randall, Circuit Judge, dissented and
filed opinion in which Brown, Roney, Gee,
Tjoflat, James C. Hill, Fay, Alvin B. Rubin,
Reavley and Hatchett, Circuit Judges,
joined.

W. Eugene Rutledge, Birmingham, Ala., for plaintiffs-appellants.

George B. Azar, Montgomery, Ala., for Rakerd.

Frank M. Young, III, Meade Whitaker, Jr., Birmingham, Ala., for Cecil Lamberson and Jackson Municipals, Inc.

Hobart McWhorter, Jr., Samuel H. Franklin, Birmingham, Ala., for Capell, Howard, Knabe & Cobbs.

Henry E. Simpson, Birmingham, Ala., for First Alabama Bank of Phenix City.

B. G. Minisman, Jr., Birmingham, Ala., for Asa G. Candler, V.

Crawford S. McGivaren, Jr., Larry B. Childs, Cabaniss, Johnston, Gardner, Dumas & O'Neal, Birmingham, Ala., for defendants-appellees.

Before BROWN, COLEMAN, AINSWORTH, CHARLES CLARK, RONEY, GEE, TJOFLAT, HILL, FAY, RUBIN, KRAVITCH, FRANK M. JOHNSON, Jr., GARZA, HENDERSON, REAVLEY, POLITZ, HATCHETT, ANDERSON, RANDALL, TATE, SAM D. JOHNSON, and THOMAS A. CLARK, Circuit Judges.*

CHARLES CLARK, Circuit Judge:

Clarence E. Bishop, Jr., was one of a number of purchasers of First Mortgage Revenue Bonds of the Industrial Development Board of Frisco City, Alabama ["Bonds"]. The lessee of the industrial business premises, the sole source of the income necessary to amortize the revenue Bonds, almost immediately defaulted in the payment of rent, causing the value of the

---

* Chief Judge Godbold and Judge Vance were disqualified in this case. Judge Williams does not wish to participate in the decision.

Bonds to drop precipitously.[1] Bishop sued most of those involved with the issuance of the Bonds, alleging that he was the victim of a pervasive scheme to defraud members of the investing public in violation of the securities laws. In essence, the complaint alleged that the defendants had fabricated a materially misleading Offering Circular in order to induce the Industrial Development Board ["Board"] to issue, and the public to buy, fraudulently marketed bonds.[2]

After twice allowing Bishop to amend his complaint, the district court entered summary judgment for the defendants. Based on Bishop's statement in his answers to interrogatories that he never saw nor was he aware of the Offering Circular when he decided to purchase the Bonds, the district court concluded that Bishop had in no way relied on the Circular's alleged misrepresentations or omissions and that his lack of reliance was fatal to his claim. We reheard this case en banc to determine whether a plaintiff must rely specifically on material misrepresentations or omissions in a single disclosure document when, in addition to charges based on its untrue statements or misleading omissions, other allegations would admit proof that the existence of the security in the marketplace resulted from the successful perpetration of a fraud on the investment community and that he purchased in reliance on the market. We hold the securities laws and regulations have a purpose broader than merely criticizing ever-lengthening, complex prospectuses. They cover deliberate, manipulative schemes to defraud which can annul not only the purpose of disclosure but also the market's honest function. Since plaintiff's pleadings would permit such proof, his suit should not have been dismissed at this initial stage. Accordingly, we vacate the judgment of dismissal and remand the case for further proceedings.

1.  After the sale of the lessee's plant, the identifiable Bond holders received $373.33 per $1000 bond.

2.  Throughout the opinion we refer to these Bonds as being "fraudulently marketed." This means the fraudulent scheme alleged by Bishop was so pervasive that without it the issuer

## I.

■ During the nearly two years from the time Bishop filed his complaint until the district court entered final judgment, this case did not proceed past the pleading and discovery stage. The court, on the defendants' motions to dismiss, considered matters outside the pleadings, treated the motion as one for summary judgment,[3] and entered judgment for the defendants, because the discovery materials considered showed there to be no genuine issue as to the fact of Bishop's lack of reliance on the Offering Circular. In considering the propriety of summary judgment, plaintiff's factual version must be taken as true. *Bishop v. Wood*, 426 U.S. 341, 347, 96 S.Ct. 2074, 2079, 48 L.Ed.2d 684, 691 (1976); *E. C. Ernst, Inc. v. General Motors Corp.*, 537 F.2d 105, 108 (5th Cir. 1976).

■ The only fact material to the decision of the district court in dismissing Bishop's complaint was that he did not rely on statements or omissions in the Offering Circular. While that admission correctly controlled the disposition of Bishop's claim that the Circular contained material misrepresentations and omissions (see Part III), we hold its consideration was improper in determining to dismiss his claim based on fraud in bringing the bonds into the marketplace (see Part IV). Therefore, in regard to the latter claim, the dismissal is truly on the pleadings alone. Under *Conley v. Gibson*, 355 U.S. 41, 45, 78 S.Ct. 99, 101, 2 L.Ed.2d 80 (1957), review of the dismissal of this part of the complaint requires us to determine whether Bishop could prove any set of facts in support of his claim which would entitle him to relief.

Reciting the facts most favorably to the plaintiff, as we do below, does not imply that he can prove his allegations.

would not have issued, the dealer could not have dealt in, and the buyer could not have bought these Bonds, because they would not have been offered on the market at any price.

3.  Fed.R.Civ.P. 12(b) and 56.

## II.

The bond issue in question had its genesis in 1972 when J. C. Harrelson, president and chief shareholder of Alabama Supply and Equipment Company [ASECo], and Clarence Hamilton, president of Investors Associates of America, Inc., a Tennessee underwriter, decided to seek industrial development financing to construct and equip a facility for the construction of mobile homes in Frisco City, Alabama. Alabama law provides for such financing pursuant to the Wallace-Cater Act, codified in §§ 11–54–80 *et seq.*, Code of Alabama (1975), which authorizes the incorporation of an Industrial Development Board in a municipality in order to induce industry to locate in Alabama. *Id.* § 11–54–81. Such a board has the authority to issue tax-exempt bonds. *Id.* §§ 11–54–87, 11–54–96. With the proceeds of such an issue, a board can build an industrial facility, which it may then lease to a manufacturing, industrial, or commercial enterprise. *Id.* § 11–54–87. The amount of rental payments is calculated to amortize the interest and principal of the bonds and is ostensibly lower than that which could be obtained without tax-free financing.

The Bonds are revenue bonds, not general obligation bonds of the municipality. They must be secured by a pledge of the revenues and receipts from the lease and may be further secured by a mortgage or deed of trust covering the project from which revenues are to be derived. *Id.* § 11–54–90. The municipality is in no event liable for the payment of any of a board's obligations, *id.* § 11–54–92; the sole source for the satisfaction of interest obligations and retirement of principal is the lessee's rent payments. *Id.* § 11–54–89.

Neither Harrelson nor ASECo was a paragon of financial integrity or industrial ability. Harrelson had been only moderately successful in previous business ventures and had little experience in the development of plants for the construction of modular or mobile homes. ASECo's management was inept and unsophisticated, its projections for the sales of mobile homes were mere marketing assumptions, and its financial condition was weak. Indeed, Harrelson and Hamilton both knew that ASECo did not have the financial capability to engage in the manufacture of mobile homes and related products or to pay the rent necessary to amortize the principal and interest on the Bonds. Nevertheless, they determined to induce the Town of Frisco City to create an Industrial Development Board to finance ASECo's facility as a scheme to defraud the investing public.

Hamilton retained defendant Jerald H. Sklar, a Tennessee attorney, as bond counsel. Sklar instructed Investors Associates to conduct an investigation of ASECo and retained John Andrews of Capell, Howard, Knabe & Cobbs, a Montgomery, Alabama, law firm, as bond co-counsel. Andrews saw to the incorporation of the Industrial Development Board of Frisco City and issued an opinion on the legality of the authorization and issuance of the Bonds. Sklar drafted the lease, indenture of trust, mortgage, authorizing resolution, guarantee, and closing papers. The Board entered into a lease with ASECo on November 1, 1972. It required ASECo to pay as base rent the amount necessary to amortize the interest and principal of the Bonds. Harrelson unconditionally guaranteed ASECo's payment of rent under the lease. The Board then adopted the resolution adopting the bond issue. The ability of the Board to meet its financial obligations under the issue depended entirely on ASECo's and Harrelson's financial solvency.

Sklar also drafted the Offering Circular, based on material furnished to him by the underwriter, the lessee company, and those associated with them, but he intentionally or recklessly disregarded other facts of which he was aware. Sklar omitted from the Offering Circular, for example, that the Securities and Exchange Commission had investigated and commenced a civil action against Hamilton and Investors Associates (and against Jackson Municipals, Inc., the assignee who ultimately underwrote the issue) for violations of the securities laws; he even failed to name the underwriter in the

Offering Circular. He misleadingly portrayed ASECo as the owner of 519 acres of Florida real estate valued at $2,284,000, already approved for development, recklessly disregarding not only that ASECo had filed no development plans but also that it had no ownership or equity interest in the property. Although Sklar knew that Harrelson had been only moderately successful at past efforts, he falsely represented Harrelson in the Offering Circular as a successful and experienced developer of modular home manufacturing plans with well-established mobile home sales. Furthermore, Sklar relied on an opinion letter that no actions were pending against or threatening ASECo, even though the opinion letter was obviously deficient and was prepared by a lawyer other than the one originally selected to give an opinion, as Sklar knew. In fact, an action affecting the Florida investment real estate listed on ASECo's balance sheet was pending at the time of the opinion letter.

Part of the information Sklar incorporated into the Offering Circular was a financial statement prepared by George C. Rakard, a certified public accountant from Salem, Illinois. Rakard's financial statement was materially false and misleading because of numerous misrepresentations and omissions. It included as assets of ASECo a number of items of doubtful worth. Open notes and capital stock subscriptions from Harrelson and his wife were valued at $376,000, in reckless disregard of their true value and without taking into account the Harrelsons' probable inability to satisfy these obligations. Three-quarters of the assets were investment properties, including the Florida real estate in which ASECo in fact had no interest. Moreover, Although Rakard's forwarding letter accompanying the financial statement stated that the audit fairly presented the financial condition of ASECo, Rakard knew or recklessly disregarded the fact that the financial statement constituted mere "window dressing" that did not fairly present ASECo's financial condition.

By the time Sklar incorporated Rakard's financial statement into the Offering Circular, he knew or recklessly disregarded the fact that Harrelson was already in default on at least one of the notes listed as an asset of ASECo and that ASECo was in default on its obligation in the lease to maintain at least $400,000 in working capital.

Meanwhile, Investors Associates had determined that it did not possess sufficient capital to underwrite the proposed issue and assigned the right to underwrite the issue to Jackson Municipals, Inc., a Tennessee underwriting firm headed by Cecil Lamberson. Jackson Municipals and Lamberson proceeded to offer the Bonds for sale to the public on the basis of the Offering Circular, even though they knew it contained materially false misrepresentations and omissions. They knew Harrelson was inexperienced and unsophisticated, contrary to the Offering Circular's representation. They purported to rely on Hamilton and Investors Associates, but because they were all defendants in the same SEC action (which the Offering Circular failed to disclose) they knew that Investors Associates needed to induce another firm to underwrite the bond issue or it would lose the value of all the time and effort it had put into the issue thus far.

Lamberson and Jackson Municipals knew that while Harrelson was not as financially secure as represented, 95% of ASECo's current assets consisted of open notes from Harrelson and over 75% of ASECo's listed assets was the Florida real estate, but failed to investigate the true value of either of these assets. They knew that the financial statement did not reflect ASECo's true assets. They even failed to inquire whether Harrelson had paid $200,000 due ASECo on a stock subscription, knowing that ASECo would be in default if Harrelson had not. In spite of this knowledge, Jackson Municipals bought the bond issue from the Board in three increments, commencing on December 14, 1972, and resold the Bonds to securities dealers.

The Phenix National Bank (now the First Alabama Bank of Phenix City, NA) had been chosen to act as trustee of the Bond

proceeds. The Bank's responsibility was to ensure that the lessee complied with the terms and conditions of the lease, one of which was that ASECo at all times have working capital in the amount of $400,-000.00 or more. The Bank had the duty to determine the existence of any default in the lease requirements by the lessee, and to demand a cure of the default or else declare the Bonds due and payable upon failure to cure. The Bank's responsibility commenced with the sale of the first increment of the Bonds, which took place on December 14, 1972. The Bank knew or recklessly disregarded from the date its duties as trustee commenced that ASECo was in breach of the lease requirement that it maintain $400,000.00 in working capital.

The Board entered into an agreement with Coliseum Properties, Inc., to construct part of the facilities contemplated by the bond issue. Coliseum Properties, however, merely served as a vehicle by which substantial parts of the proceeds of the issue were diverted and used for the benefit of others. In particular, the controlling persons of the parent corporation of Coliseum Properties, the so-called "Candler defendants," made improper payments to ASECo and to Harrelson in exchange for the construction contract; moreover, Coliseum Properties and some of its officers were under indictment in several pending suits. None of this information was known to the Board when it entered into the agreement with Coliseum Properties.

In January 1973, Bishop spoke with his broker, Tom Monks, president of Professional Securities, Inc., a Birmingham securities dealer, about Bishop's investment possibilities. Monks advised Bishop that tax-free Bonds, such as those issued by the Industrial Development Board of the Town of Frisco City, Alabama, were a good investment and he told Bishop of others in the community who had purchased such Bonds.

Bishop purchased three of the Bonds in January, paying $3,052.67, and one more in February, for $1,043.37. The Offering Circular offered the Bonds for sale at 86, that is for $860 per Bond, yet Bishop paid par—$1,000 plus accrued interest for each Bond. The district court found Bishop purchased as part of the primary offering. However, the record does not disclose whether Bishop purchased directly from Jackson Municipals (and, if so, why the price was not as offered), or from his broker acting as principal or from a seller in the secondary market. Industrial development bonds from towns like Frisco City are not ordinarily traded in a secondary market, but Lamberson stated in deposition that these bonds were being traded, that they were marketable securities, and that his firm had bought and sold some. Indeed, it appears that in addition to its underwriting discount, Jackson Municipals had earned $4,500 by trading these securities in the secondary market. The record is likewise silent as to whether Bishop's purchase was the result of one of these trades.

Bishop never saw the Offering Circular nor knew one existed. He bought the Bonds based solely on his broker's oral representations. At about the same time, he purchased a variety of other municipal bonds offered by various industrial development boards, gas districts, and utility authorities, presumably on similar oral advice from his broker.

After the ASECo plant had been constructed, the lessee ceased all operations at the plant and, on April 15, 1974, defaulted in payment of rent under the lease. Although Harrelson had unconditionally guaranteed the performance of the lease by ASECo, he did not have sufficient assets to back up his guarantee. The Trustee Bank declared the lease in default.

### III.

Bishop's original complaint sought relief for himself and for the class of all purchasers of the Bonds under the Securities Act of 1933, 15 U.S.C. § 77a et seq., the Securities Exchange Act of 1934, 15 U.S.C. § 78a et seq., rule 10b–5, 17 C.F.R. § 240.10b–5, and an unspecified Alabama law. The court dismissed all claims under the 1933 Act, which dismissal Bishop does not appeal, but

permitted Bishop to amend his complaint twice in order to allege that he relied on the Offering Circular. Bishop's inability to make such an allegation resulted in the dismissal here on appeal.

■ To the extent that Bishop pleaded the usual 10b–5 misrepresentation or omission case, the district court was correct. Reliance is an essential element of such a cause of action, though the burden of proving or disproving reliance may shift depending on the nature of the case. The elements of a classic misrepresentation action are: (1) the defendant must make a false representation of a material fact, (2) knowing its falsity and intending that the plaintiff rely on it, (3) the plaintiff must justifiably rely on it, and (4) suffer damage as a result. *See* III L. Loss, Securities Regulation 1431 (1961); *Dupuy v. Dupuy*, 551 F.2d 1005, 1014 (5th Cir. 1977). Because reliance is so difficult to prove when a defendant has failed to disclose a material fact rather than misrepresenting it, the Supreme Court has allowed the trier of fact to presume reliance in an omission case where the plaintiffs could justifiably expect that the defendants would disclose material information. *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972). *Ute* did not eliminate reliance as an element of a 10b–5 omission case; it merely established a presumption that made it possible for the plaintiffs to meet their burden. When the *Ute* presumption attaches, the defendant may rebut it by showing that the plaintiff did not rely on the defendant's duty to disclose. If the plaintiff would have followed the same course of conduct even with full and honest disclosure, then the defendant's action (or lack thereof) cannot be said to have caused plaintiff's loss. *See Simon v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 482 F.2d 880 (5th Cir. 1973), *explained in Rifkin v. Crow*, 574 F.2d 256 (5th Cir. 1978).

■ Bishop alleged that the Offering Circular contained material misrepresentations and failed to state material facts necessary to make the statements made not misleading. At the same time, he admitted

that he never read or otherwise relied on the Offering Circular. If the *Ute* presumption applies to these nondisclosures, Bishop's admission rebuts it. Bishop's claim that he was deceived by the misrepresentations and omissions of the Offering Circular was correctly dismissed by the district court because of his failure to read or even seek to read the Offering Circular.

### IV.

The district court erred, however, in construing the remainder of Bishop's complaint as narrowly confined to charges of misrepresentations and omissions in the Offering Circular that would have defrauded investors who did rely. It would permit proof that the defendants engaged in an elaborate scheme to create a bond issue that would appear genuine but was so lacking in basic requirements that the Bonds would never have been approved by the Board nor presented by the underwriters had any one of the participants in the scheme not acted with intent to defraud or in reckless disregard of whether the other defendants were perpetrating a fraud. Rather than containing the entire fraud, the Offering Circular was assertedly only one step in the course of an elaborate scheme.

Rule 10b–5 provides in part:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, . . .

(1) to employ any device, scheme, or artifice to defraud,

(2) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or

(3) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

Bishop's complaint specifically tracks the language of all three subsections of the

rule.[4] As we have stated in Part III, Bishop's 10b–5(2) claim contained in Count I cannot withstand his admitted lack of reliance on the Offering Circular. However, his 10b–5(1) and (3) claims in Counts I and II assert something more that prevents dismissal at this preliminary stage.

■ Bishop could prove that he made a general request to his broker to purchase industrial development bonds, that his actual purchases covered a number of different issues, and that he did not undertake to determine which among the issues then offered were the most prudent investments or to second-guess the underwriters in the price and coupon rate they set. His pleadings would permit him to show that he was willing to accept any marketable risk. If a municipal authority was willing to authorize the issuance of the Bond, and the underwriters were willing to present the issue to the market, that was sufficient for Bishop's purposes. His pleadings allow him to show that he sought to make investments in securities which were entitled to be marketed.

■ It is unnecessary here to decide whether a distinction should be drawn between the terms "loss causation" and "transaction causation." *See Schlick v. Penn-Dixie Cement Corp.*, 507 F.2d 374, 384 (2d Cir. 1974) (Frankel, J., concurring). The concept of this scheme to defraud satisfies the requirement of "transaction causation." *Id.* at 381; 1 A. Bromberg & L. Lowenfels, Securities Fraud & Commodities Fraud § 4.7 (558)–(559), at 86.25, 86.32 (1979).[5] It has as its core objective that the potential victim engage in the transaction for which the scheme was conceived. The requisite element of causation in fact would be established if Bishop proved the scheme was intended to and did bring the Bonds onto the market fraudulently and proved he relied on the integrity of the offerings of the securities market. His lack of reliance on the Offering Circular, only one component of the overall scheme, is not determinative. *Blackie v. Barrack*, 524 F.2d 891, 906 (9th Cir. 1975).

■ Bishop has alleged the necessary elements of an action under 10b–5(1) or (3). In the literal words of rule 10b–5, he must be able to show a "scheme . . . to defraud . . . or . . . [an] act, practice or course of business which operates . . . as a fraud or deceit upon [him] . . . in connection with the sale of [the Bonds] . . . ." Bishop's burden of proof will be to show that (1) the defendants knowingly conspired to bring securities onto the market which were not entitled to be marketed, intending to defraud purchasers, (2) Bishop reasonably re-

---

4. In Count I he states;

    In connection with the sale of the Bonds, J. C. Harrelson (now deceased) and others, by the use and means of instrumentalities of interstate commerce and the mails, did or caused the following to be done:

    (a) Employed one or more devices, schemes and artifices to defraud Plaintiff and members of the class;

    (b) Made to Plaintiff and other members of the class, untrue statements of material fact and omitted to state material facts necessary to be made in order to make the statements made, in the light of the circumstances under which they were made, not misleading in connection with the purchase or sale of the Bonds;

    (c) Engaged in acts, practices and courses of business and conduct which operated as a fraud and deceit upon plaintiff and members of the class in connection with the purchase and sale of the Bonds.

In Count II his allegations practically reiterate 10b–5(1) and (3):

    In connection with the offer and sale of the bonds, the defendants hereinafter named entered into and participated with J. C. Harrelson in a conspiracy, scheme or agreement to employ devices, schemes and artifices to defraud, and to engage in acts, practices and courses of business which would and did operate as a fraud and deceit upon the Plaintiff and other members of the class sued for herein.

5. Misrepresentation actions brought under 10b–5(2) may require a separate showing of "transaction causation." In such a case, "the test of 'reliance' is whether 'the misrepresentation is a substantial factor in determining the course of conduct which results in [the recipient's] loss.' " *List v. Fashion Park, Inc.*, 340 F.2d 457, 462 (2d Cir. 1965) (quoting Restatement, Torts § 546 (1938)). Doing away with the conventional reliance requirement in a 10b–5(2) case, therefore, could establish a scheme of investors' insurance.

**470**

lied on the Bonds' availability on the market as an indication of their apparent genuineness,[6] and (3) as a result of the scheme to defraud, he suffered a loss.

## V.

The thrust of the arguments against our holding is that a recovery in this circumstance is not consonant with the central purpose of the securities laws, which, it is argued, is to provide full disclosure so that investors may make informed investment decisions. It is asserted that allowing recovery to one who has never read the Offering Circular minimizes the importance of such documents and discourages investors from reading them.[7]

We disagree. First, the purposes of the securities acts and rule 10b–5 are far broader than merely providing full disclosure or fostering informed investment decisions. The Supreme Court has held that the acts were designed "to protect investors against fraud and ... to promote ethical standards of honesty and fair dealing. See H.R. Rep.No. 85, 73d Cong., 1st Sess., 1–5 (1933)." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 195, 96 S.Ct. 1375, 1382, 47 L.Ed.2d 668, 677 (1976). This court has held that "[t]he basic intent of section 10(b) and rule 10b–5 and indeed, of the Exchange Act, is to protect investors and instill confidence in the securities markets by penalizing unfair dealings." *Sargent v. Genesco, Inc.*, 492 F.2d 750, 760 (5th Cir. 1974). *See also*

*Woodward v. Metro Bank of Dallas*, 522 F.2d 84, 91, 93 n.20 (5th Cir. 1975); *Shapiro v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 495 F.2d 228, 235, 240 (2d Cir. 1974) ("to secure fair dealing"). Thus, the central purpose of the acts is the protection of investors, *Tcherepnin v. Knight*, 389 U.S. 332, 336, 88 S.Ct. 548, 553, 19 L.Ed.2d 564, 569 (1967); *Woodward v. Metro Bank*, 522 F.2d 84, 91 (5th Cir. 1975); *Bellah v. First National Bank*, 495 F.2d 1109, 1111 (5th Cir. 1974); *Herpich v. Wallace*, 430 F.2d 792, 801, 806–08 (5th Cir. 1970), and the promotion of free and honest securities markets. *Id.* The acts reach complex fraudulent schemes as well as lesser misrepresentations or omissions. Full disclosure is only one means, albeit a central one, of achieving these paramount goals.[8]

Second, the role of the Offering Circular will continue undiminished even if Bishop proves his allegations and recovers. He has alleged that the fraud caused the Bonds to be offered for sale on the market. If Bishop proves no more than that the bonds would have been offered at a lower price or a higher rate, rather than that they would never have been issued or marketed, he cannot recover. Thus, a purchaser of securities will still have the strongest incentive to read the disclosure statement if he wants to ensure he gets full value for his securities purchases.

Under Bishop's broader theory, it would have availed him nothing to have read the

---

**6.** After *Hochfelder, infra*, this circuit's requirement that the reliance be reasonable or justifiable means only that the plaintiff must not "intentionally refuse[ ] to investigate 'in disregard of a risk known to him or so obvious that he must be taken to have been aware of it, and so great as to make it highly probable that harm would follow.' " *Dupuy v. Dupuy*, 551 F.2d 1005, 1020 (5th Cir. 1977) (quoting W. Prosser, Law of Torts § 34, at 185 (1971)). Defendants do not suggest that a decision to invest in the municipal obligations of Frisco City, Alabama, without more, constitutes an intentional disregard of an obvious risk.

**7.** This argument ignores § 11 of the Securities Act of 1933, which allows recovery for untrue statements or omissions of a material fact in the registration statement without proof of reliance. Even when the exception in § 11(a) applies, a plaintiff need not prove that he read

the registration statement. Although municipal bonds are exempt from the registration requirements of the 1933 Act, the exemption does not indicate a congressional intent that aggrieved purchasers of municipal bonds must have read an Offering Circular in order to recover. Certainly there are differences between §§ 11 and 12 of the 1933 Act and § 10(b) of the 1934 Act and rule 10b–5. We point to the former provisions only to indicate that Congress did not have a pervasive intent to require plaintiffs under the securities laws to read or rely specifically on a prospectus or circular.

**8.** The schemes must, of course, be one within the "manipulative" condemnation of the securities law. *Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977). This one clearly is.

Offering Circular. This theory is not that he bought inferior bonds, but that the Bonds he bought were fraudulently marketed. The securities laws allow an investor to rely on the integrity of the market to the extent that the securities it offers to him for purchase are entitled to be in the market place.

Finally, we reject the contention that our holding imposes new burdens on defendants or enhances their liability. Lawyers, underwriters, and accountants who participate in bond issues in good faith are unaffected by our decision. Liability results only if they act with intent to deceive or defraud. None of these parties may be held liable for mere negligent performance of whatever role they choose to play, for the plaintiff must prove that the defendants acted with the requisite scienter. *See Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976); *Aaron v. SEC*, 446 U.S. 680, 100 S.Ct. 1945, 64 L.Ed.2d 611 (1980).[9]

### VI.

The dissent asserts that we adopt a "new theory" because we separate Bishop's claim under 10b–5(2) that the Offering Circular was misleading from his claim under 10b–5(1) and (3) that defendants' fraudulently marketed Bonds caused his loss. It is not our "theory" but the words of rule 10b–5 which confer the right of action we hold Bishop is entitled to try to prove. Contrary to the assertion of the dissent, neither this court nor the Supreme Court has held these parts of the rule do not mean what they say. Misrepresentation and omission cases under 10b–5(2) which, as we do, require reliance on the document making the misrepresentation or omitting a material fact are inapposite to a case in which the buyer relied on the integrity of the market to

furnish securities which were not the product of a fraudulent scheme. This circuit has said so,[10] and other circuits have also.[11] There is no Supreme Court precedent to the contrary.

We do not overrule *Rifkin v. Crow*. Rather, we cite it approvingly for the rule 10b–5(2) principle it decides and hold it requires affirmance of the dismissal of that part of Bishop's claim. Moreover, *Rifkin*, is helpful to our holding here in two other respects. It points out that this circuit had not previously decided whether a buyer could rely on a "fraud on the market" theory as developed in the Second and Ninth Circuits.[12] *Rifkin* also explains that our prior decision in *Simon v. Merrill Lynch, Pierce, Fenner & Smith*, (holding the lack of "general reliance" on a stockbroker's misrepresentations foreclosed any right of action) would not apply to such a broader theory of fraud if it were developed on remand. "In other words, *Simon's* 'general reliance' language simply requires there to be a causal link between defendant's violation and plaintiff's harm in order for plaintiff to recover." 574 F.2d 262 n.1.

The dissent asserts that *Affiliated Ute Citizens v. United States*, and *List v. Fashion Park, Inc.*, taken together suggest that Bishop's admitted nonreliance on statements or omissions in the Offering Circular precludes any recovery for harm caused by the broader scheme to bring the Bonds onto the market by fraud. We disagree. *Ute* and *List* emphasized that the role of reliance in securities actions is to establish causation. In *Ute*, silence in the face of a duty by bank employees to disclose self-dealing established "the requisite element of causation in fact." 406 U.S. at 154, 92 S.Ct. at 1472. Furthermore, *Ute* expressly recognized that rule 10b–5 was not limited to dealing with misrepresentation or omis-

---

9. The Court has yet to decide "whether, under some circumstance, scienter may also include reckless behavior." *Aaron*, 446 U.S. at 686 n.5, 100 S.Ct. at 1950 n.5. This court has decided that it may. See *Huddleston v. Herman & MacLean*, 640 F.2d 534, 535, 545 (5th Cir. 1981); *Thompson & Co., Inc. v. Partridge*, 636 F.2d 945, 959 (5th Cir. 1981).

10. *Rifkin v. Crow*, 574 F.2d 256 (5th Cir. 1978).

11. *Blackie v. Barrack*, 524 F.2d 891 (9th Cir. 1975); *Schlick v. Penn Dixie Cement Corp.*, 507 F.2d 374 (2d Cir. 1974).

12. *See* cases cited in footnote 11, *supra*.

sion cases under 10b–5(2), but reached "a 'course of business' or a 'device, scheme or artifice' that operated as a fraud. . . ." 406 U.S. at 153, 92 S.Ct. at 1472. *List* stated that the reason for the reliance requirement "is to certify that the conduct of the defendant actually caused the plaintiff's injury." 340 F.2d at 462. Whenever the rule 10b–5 issue shifts from misrepresentation or omission in a document to fraud on a broader scale, the search for causation must shift also. The "reliance" that produces causation in the latter type of case cannot come from reading a document. It may arise from the duty to speak as in *Ute*, a scheme to manipulate the market at a time when a merger had forced a sale as in *Schlick*, a scheme to inflate common stock prices by misleading statements as in *Rifkin*, or a claim by a bond buyer that he relied on the market to provide securities that were not fraudulently created as we have here. The most significant common thread in all these precedents is that rule 10b–5 is not limited to a narrow right to recover for knowing fraudulent misrepresentations or omissions in disclosure documents which mislead a securities buyer. The rule is recognized also to provide the basis for a federal cause of action for more elaborate, intentional schemes which deceive or defraud purchasers of securities.

The dissent suggests that our holding needlessly imports a state law cause of action for conversion into the federal securities law. Again we disagree. It is the recognized right of action created by rule 10b–5 which we hold Bishop was denied. This cause of action has its roots in congressional enactment, federal regulation and federal precedent. We merely decline to diminish it.

## VII.

The judgment dismissing plaintiff's complaint is vacated and the cause remanded for further proceedings not inconsistent with this opinion. The district court also ruled that this action could not be maintained as a class action because of lack of typicality, lack of adequate representation, and lack of a showing that common questions of fact would predominate. All three of these determinations, however, were premised on the belief that reliance on the Offering Circular was crucial to Bishop's claim. On remand, the court must reconsider the maintainability of this action as a class action as to members of a properly defined class of Bond purchasers who did not so rely.[13]

VACATED and REMANDED.

RANDALL, Circuit Judge, with whom BROWN, RONEY, GEE, TJOFLAT, JAMES C. HILL, FAY, ALVIN B. RUBIN, REAVLEY and HATCHETT, Circuit Judges, join, dissenting.

The majority opinion today adopts a new theory of recovery in federal court under Rule 10b–5. It holds that a purchaser of securities offered to the public by means of a misleading offering circular, who has heretofore been foreclosed from recovering in federal court under Rule 10b–5 because of his admitted lack of reliance on the offering circular, will not henceforth be foreclosed from recovering under the Rule if he is able to prove that the defendants knowingly conspired to bring securities onto the market which were not "entitled to be marketed" and that he reasonably relied on the availability of the securities on the market as an indication of their entitlement to be marketed.

This newly-devised route to recovery under Rule 10b–5 is completely without supporting precedent; indeed, it conflicts with the prior decisions of this and every other circuit and with the clear implication of recent Supreme Court decisions in the securities field. But even if the majority were writing on a blank slate, its novel holding would be profoundly unwise for several reasons. First, it introduces into the law under Rule 10b–5 a distinction between securi-

---

**13.** The court previously determined the maintainability of a rule 10b–5(2) class action for Bond buyers who could establish reliance on the Offering Circular. The requirement to reconsider the maintainability of an additional class action does not affect that determination.

ties that are "entitled to be marketed," *i. e.*, securities that may be the subject of a fraudulent marketing scheme, but which, absent the fraud, could be sold at *some* price, and securities that are not "entitled to be marketed," *i. e.*, securities that are the subject of a fraudulent marketing scheme and that, absent the fraud, could not be sold at *any* price. The requirements for recovery under Rule 10b–5 in any case hinge upon which category of securities the defrauded plaintiff purchased. If he purchased a security that was entitled to be marketed, he must have relied on the defendants' misrepresentations or omissions in order to recover. If, however, he can show that he purchased a security which was not entitled to be marketed, he can recover in spite of his nonreliance on the defendants' misrepresentations or omissions if he can show that he reasonably relied on the integrity of the marketplace to offer him securities that were entitled to be marketed. This novel theory permits recovery under the Rule to one who has elected not even to seek to read what the seller is obligated by the Rule to disclose, thereby defeating the primary objective of the Rule—the making of an informed investment decision. Second, the majority opinion has great potential for increasing the volume of litigation under Rule 10b–5 by providing a federal forum to those plaintiffs who by their own actions would otherwise have forfeited the protection of the Rule and have relegated themselves to state court actions for conversion. Finally, the majority opinion also has great potential for protracting much Rule 10b–5 litigation that would heretofore have terminated at the summary judgment stage. For these reasons, I respectfully dissent.

## I. THE MAJORITY'S TREATMENT OF THE RELIANCE REQUIREMENT

The majority begins part III of its opinion by acknowledging that reliance is an essential element of a misrepresentation or omission case under section 10(b) of the Securities Exchange Act of 1934 (the "1934 Act"), 15 U.S.C. § 78j(b) (1976). The opinion notes that the trier of fact may presume reliance in an omissions case (as distinguished from a misrepresentations case) in which the plaintiff could justifiably have expected that the defendant would disclose material information. However, that presumption is said by the majority to be rebuttable and is held to have been rebutted in this case by Bishop's admitted failure to read or even seek to read the offering circular.

The majority opinion goes on to distinguish between Bishop's Rule 10b–5(2) case based on misrepresentations and omissions in the offering circular, as to which summary judgment was proper because of Bishop's admitted lack of reliance on the offering circular, and Bishop's Rule 10b–5(1) and (3) case based upon a scheme to defraud and an act that operates as a fraud, each having as its objective the issue and sale of bonds which were not entitled to be marketed. As to the latter case, lack of reliance by the plaintiff on the offering circular, which is described as "only one component of the overall scheme," is held to be not fatal. Instead, proof of reliance by the plaintiff on the availability of the bonds on the market as an indication that they were entitled to be marketed will suffice.

By way of explanation, the majority opinion tells us that the role of reliance in securities actions is to establish causation, and that whenever the issue under Rule 10b–5 shifts from misrepresentations or omissions in a document to "fraud on a broader scale," the search for causation must also shift. In fraud on a broader scale, the reliance that establishes causation "cannot come from reading a document," but instead can consist of reliance on the market to provide securities that are entitled to be marketed. Thus we are told that we need to view Bishop's case as not simply one of the class of cases in which the fraud is accomplished by means of misrepresentations and omissions in an offering circular (in which the absence of reliance by the plaintiff on the offering circular would be fatal to the plaintiff's case) but instead as one in a class of cases involving "fraud on a broader scale" or "more elaborate, inten-

474

tional schemes which deceive or defraud purchasers of securities" (in which the reliance that is needed is simply reliance on the integrity of the market to provide securities that are entitled to be marketed). We are told this in spite of the fact that Bishop's complaint is *accurately* summarized in the opening lines of the majority opinion as alleging "in essence . . . that the defendants had fabricated a materially misleading Offering Circular in order to induce the Industrial Development Board ['Board'] to issue, and the public to buy, fraudulently marketed bonds."

The only direct authority cited by the majority for its novel holding is the Rule itself,[1] which makes it unlawful in connection with the sale of a security to employ any scheme to defraud (clause 1) or to engage in any act which operates as a fraud (clause 3). With deference, I suggest that if it were possible to circumvent the requirement of clause (2) of the Rule of reliance on the defendants' misrepresentations or omissions simply by falling back on the sweeping language of clauses (1) and (3) of the Rule in combination with allegations of elaborate fraud, there would be numerous cases to cite as direct authority for the majority's holding. In fact, there are none.

## II. PRIOR PRECEDENT RELATING TO THE RELIANCE REQUIREMENT

### A. The Origins and Function of the Reliance Requirement

Perhaps the seminal modern case on the reliance requirement is *List v. Fashion Park, Inc.,* 340 F.2d 457 (2d Cir.), *cert. denied,* 382 U.S. 811, 86 S.Ct. 23, 15 L.Ed.2d 60 (1965). The gravamen of List's complaint was that the defendants had utterly failed to disclose certain material facts, and that as a result thereof, he had lost money in selling securities.[2] The defendants argued that the language of clauses (1) and (2) of Rule 10b–5 could not support liability in a total nondisclosure case, but the Second Circuit firmly rejected the defendants' suggested distinctions that were based on the differing language of the three clauses; instead, the court relied upon the Rule as a whole for its holding that total nondisclosures fell within the ambit of Rule 10b–5 and section 10(b). *Id.* at 462. Drawing upon the elements of the common law tort of misrepresentation, the Second Circuit incorporated into the private cause of action under Rule 10b–5 the requirement that the plaintiff have relied upon the defendants' misrepresentations or omissions, even in a total nondisclosure case:

> [T]he test of 'reliance' is whether 'the misrepresentation is a substantial factor in determining the course of conduct which results in [the recipient's] loss.' . . . The reason for this requirement . . . is to certify that the conduct of the defendant actually caused the plaintiff's injury. . . .
>
> . . . .

This interpretation of Rule 10b–5 is a reasonable one, for the aim of the rule in cases such as this is to qualify, as be-

1. In arguing that its holding does not conflict with prior precedent of this circuit or the Supreme Court, the majority virtually concedes that there is no direct *precedential* support for its interpretation of clauses (1) and (3) of the Rule: "It is not our 'theory' but the words of rule 10b–5 which confer the right of action we hold Bishop is entitled to try to prove. Contrary to the assertion of the dissent, neither this court nor the Supreme Court has held [that] these parts of the rule do not mean what they say." *Ante,* 647 F.2d at 471.

2. In *List,* the plaintiff was an experienced and successful investor who had purchased 5,100 shares of Fashion Park stock in 1959 at $13.50 per share. In November 1960, with the advice of his broker, List authorized the sale of his stock at a net price to him of not less than $18 per share. List's broker knew that at that time, two directors of Fashion Park were bidding for Fashion Park stock through the pink sheets, but the broker did not think it important to disclose this fact to List, and List made no effort to learn whether the directors were in the market for the stock. Another development was the adoption of a resolution by the board of directors of Fashion Park on November 4, 1960, to merge into another company. Fashion Park did not issue a press release about the merger. List sold his stock in mid-November 1960, at $18.50 per share, without knowing that one of Fashion Park's directors was the purchaser or that Fashion Park's management was considering the sale of the company.

tween insiders and outsiders, the doctrine of *caveat emptor*—not to establish a scheme of investors' insurance. Assuredly, to abandon the requirement of reliance would be to facilitate outsiders' proof of insiders' fraud, and to that extent the interpretation for which plaintiff contends might advance the purposes of Rule 10b–5. But this strikes us as an inadequate reason for reading out of the rule so basic an element of tort law as the principle of causation in fact.

*Id.* at 462–63 (bracketed portion inserted by Second Circuit). In applying this principle to the case before it, the Second Circuit held that the trial court's detailed findings of fact, to the effect that List would have sold his stock even had he been aware of the undisclosed information, were not clearly erroneous; accordingly, the showing of causation necessary to support a private recovery under Rule 10b–5 was missing, and List could not recover.

This court promptly adopted the rule of *List. E. g., Herpich v. Wallace,* 430 F.2d 792, 805 & n.12 (5th Cir. 1970) (citing *List* ); *Grumbles v. Times Herald Printing Co.,* 387 F.2d 593 (5th Cir.), *cert. denied,* 390 U.S. 1028, 88 S.Ct. 1419, 20 L.Ed.2d 285 (1968) (affirming per curiam a judgment for defendant on basis of adequately supported jury findings that plaintiff did not rely and that omitted facts were not material).

**B. Modifications to the Manner in Which the Reliance Requirement May Be Satisfied**

Subsequent to the *List* decision, the federal courts have developed two modifications in the manner in which reliance may be established, both of which are aimed at overcoming what would otherwise be virtually insurmountable obstacles for plaintiffs. The first modification applies only to nondisclosure cases—*i. e.,* those cases in which the defendants have remained silent in the face of a duty to disclose. The second modification applies only to certain "fraud

on the market" claims—typically class actions in which a great many plaintiffs have allegedly suffered losses in the secondary trading market as a result of misrepresentations or omissions in a series of documents promulgated by the defendants over a period of time.

*1. The rebuttable presumption of reliance in total nondisclosure cases.*—In many instances, the violation of Rule 10b–5 complained of by the plaintiff is a total failure to disclose material information, as was true in *List.* Early in the 1970s, the federal courts increasingly became aware that in such total nondisclosure cases, a plaintiff faces almost an insurmountable burden if he is required to present affirmative evidence that he relied specifically on the defendants' silence with regard to a material fact.

The Supreme Court first addressed this problem in *Affiliated Ute Citizens v. United States,* 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972). The defendants in *Affiliated Ute,* who were marketmakers in the stock of a company holding assets for certain Indians, as well as sales agents for the Indians, had remained silent as to prevailing market prices for the stock in circumstances in which they had a duty to disclose those prices. The Indians "considered these defendants to be familiar with the market for the shares of stock and *relied upon them* when they desired to sell their shares." *Id.* at 152, 92 S.Ct. at 1471 (emphasis added).[3] The Supreme Court held that the Tenth Circuit had

erred when it held that there was no violation of the Rule unless the record disclosed evidence of reliance on material fact misrepresentations by [the defendants]. We do not read Rule 10b–5 so restrictively. *To be sure, the second subparagraph of the rule specifies the making of a untrue statement of a material fact and the omission to state a material fact. The first and third subparagraphs are not so restricted.* These defendants'

---

**3.** *See also Chiarella v. United States,* 445 U.S. 222, 229–30, 100 S.Ct. 1108, 1115, 63 L.Ed.2d 348 (1980) (including, in a description of *Affili-* ated *Ute,* a reference to the reliance by the Indian sellers upon the Bank's personnel).

activities, outlined above, disclose within the very language of one or the other of those subparagraphs, a "course of business" or a "device, scheme, or artifice" that operated as a fraud upon the Indian sellers. *Superintendent of Insurance v. Bankers Life & Casualty Co.,* [404 U.S. 6, 92 S.Ct. 165, 30 L.Ed.2d 128] (1971)]. . . . The sellers had the right to know that the defendants were in a position to gain financially from their sales and that their shares were selling for a higher price in that market. . . .

*Under the circumstances of this case, involving primarily a failure to disclose, positive proof of reliance is not a prerequisite to recovery.* All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of this decision. . . . This obligation to disclose and this withholding of a material fact establish the requisite element of causation in fact.

*Id.* at 152–54, 92 S.Ct. at 1471–1472 (emphasis added; some citations omitted).

The courts of appeals have not read *Affiliated Ute* as having done away with the reliance requirement altogether. Rather, *Affiliated Ute* has been read to establish a rebuttable presumption that the plaintiff relied upon the defendant's silence in total nondisclosure cases, at least so long as the facts as to which the defendants were silent meet the materiality requirement. For example, in *Rifkin v. Crow,* 574 F.2d 256 (5th Cir. 1978), the law in this circuit on reliance was carefully summarized and restated, with special attention paid to *Affiliated Ute :*

After *Ute,* the reliance requirement has varied somewhat in articulation from circuit to circuit, but a general pattern seems to have emerged: where a 10b–5 action alleges defendant made positive misrepresentations of material information, proof of reliance by the plaintiff upon the misrepresentation is required. Upon an absence of proof on the issue, plaintiff loses. On the other hand, where a plaintiff alleges deception by defendant's nondisclosure of material information, the *Ute* presumption obviates the need for plaintiff to prove actual reliance on the omitted information. Upon a failure of proof on the issue, defendant loses. But this presumption of reliance in nondisclosure cases is not conclusive. *If defendant can prove that plaintiff did not rely, that is, that plaintiff's decision would not have been affected even if defendant had disclosed the omitted facts, then plaintiff's recovery is barred.*

*Id.* at 262–63 (footnotes omitted). *Accord, Huddleston v. Herman & MacLean,* 640 F.2d 534, 547–50 (5th Cir. 1981) ("reliance is an issue in *all* Rule 10b–5 cases"); *Dwoskin v. Rollins, Inc.,* 634 F.2d 285, 291 n.4 (5th Cir. 1981); *Moody v. Bache & Co.,* 570 F.2d 523, 528 (5th Cir. 1978); *Vohs v. Dickson,* 495 F.2d 607, 622 (5th Cir. 1974); *Rochez Brothers, Inc. v. Rhoades,* 491 F.2d 402, 410 (3d Cir. 1974); *Simon v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 482 F.2d 880, 884–85 (5th Cir. 1973). Indeed, until today, this circuit has uniformly required not only that there have been reliance (whether established by means of an unrebutted presumption under *Affiliated Ute* or proved directly by the plaintiff), but also that the plaintiff's reliance have been *reasonable.*[4]

**4.** Judge John Minor Wisdom, writing for our court in *Dupuy v. Dupuy,* 551 F.2d 1005 (5th Cir.), *cert. denied,* 434 U.S. 911, 98 S.Ct. 312, 54 L.Ed.2d 197 (1977), summarized the elements of a private cause of action under Rule 10b–5:

The courts have established that with regard to private recovery for the violation of rule 10b–5, a properly stated cause of action must establish the scienter of the defendant, the materiality of any misrepresentation or omission by the defendant, *the extent of actual reliance by the plaintiff on the defendant's statements, and the justifiability of the*

reliance, frequently translated into a requirement of due diligence by the plaintiff.
*Id.* at 1014 (emphasis added; footnotes omitted). The argument made in *Dupuy* was that because *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), required that the plaintiff prove scienter as part of his cause of action, the plaintiff's lack of diligence in investigating the information available to him should not defeat recovery because the defendant's culpability would be of a far greater degree. The *Dupuy* court rejected this argument, however:

The majority opinion does not purport to overrule any of these cases. Indeed, it specifically disclaims any intent to overrule *Rifkin* by treating it as a case arising only under clause (2) of Rule 10b–5. Admittedly, the opinion in *Rifkin* does not make an explicit distinction between cases arising under clause (2) of the Rule and those arising under clauses (1) and (3). But *Rifkin* does make a clear distinction between misrepresentation and omission cases, and its holding as to the latter is premised on *Affiliated Ute* (which was itself a holding under clauses (1) and (3)). This leads me to believe that in *Rifkin* and its progeny this court has spoken to the question of whether proof of nonreliance bars recovery in a case arising under clauses (1) and (3)—and has held that it does. *Huddleston v. Herman & MacLean, supra,* reads *Rifkin* in this manner.

Further, the majority opinion squarely conflicts with the decision of the Eighth Circuit in *Vervaecke v. Chiles, Heider & Co.,* 578 F.2d 713 (8th Cir. 1978). Although the majority chooses not to discuss *Vervaecke,* that case also involved an initial public offering of bonds and featured a plaintiff who, by his own admission, had not relied on a defective offering circular. Sensing that his admission might be fatal to a clause (2) claim, he urged that his case should be considered as one involving primarily nondisclosure cognizable under clauses (1) and (3) of Rule 10b–5. The Eighth Circuit specifically declined to do so and held instead that the district court had properly granted summary judgment for the defendants because of the plaintiff's admitted nonreliance on the offering circular.

Regardless of whether the majority opinion conflicts directly or only indirectly with the cases discussed above, it is clear at least that *none* of these prior cases dealing with the reliance requirement even indirectly supports the majority's holding today. If those cases are not explicitly overruled, I believe that for the reasons expressed below in part III, their practical vitality has been emasculated *sub silentio* by the majority.

2. *Reliance in "fraud on the market" class actions.*—In insisting that it is not overruling *Rifkin v. Crow,* the majority notes in part VI of its opinion that *Rifkin* "points out that this circuit *had not previ-*

[T]o abandon completely the consideration of reliance in fact and reasonable reliance ignores not only the above[-stated] policies of due diligence but also the need for a causal link between the misrepresentation or omission and the injury suffered by the private plaintiff. The cause of action would no longer provide compensation for losses occasioned by the violation of the [1934] Act because a plaintiff could sue without relying on the fraud. This would transform the action into an enforcement mechanism. We reject this approach . . . .
*Id.* at 1016. The court did agree, however, that *Hochfelder* called for a modification of the standard of care under which the plaintiff's conduct would be judged—*i. e.,* a modification that would broaden the definition of "reasonable" reliance. Backing away somewhat from our previous definition of reasonableness, as expressed in cases such as *Clement A. Evans & Co. v. McAlpine,* 434 F.2d 100, 103–04 (5th Cir. 1970), *cert. denied,* 402 U.S. 988, 91 S.Ct. 1660, 29 L.Ed.2d 153 (1971), the *Dupuy* court held that mere negligence was not enough to make the reliance unreasonable; instead, to defeat recovery on grounds that the plaintiff's reliance was unreasonable, the plaintiff's conduct must have been a refusal to investigate in disregard

of a risk known to him or so obvious that he must be taken to have been aware of it, and so great as to make it highly probable that harm would follow. 551 F.2d at 1020.
This court has steadfastly adhered to *Dupuy's* requirement that the plaintiff's reliance have been reasonable—*i. e.,* within the standard of care articulated by the *Dupuy* court. *See, e. g., Paul F. Newton & Co. v. Texas Commerce Bank,* 630 F.2d 1111, 1121–22 (5th Cir. 1980) (Charles Clark, J.); *Swenson v. Engelstad,* 626 F.2d 421, 424 (5th Cir. 1980).
The majority points out that there has been no allegation in this case that Bishop lacked due diligence. *Ante,* 647 F.2d at 470 n.6. But since there was positive proof of Bishop's *nonreliance,* there is simply no issue as to the reasonableness of Bishop's reliance.
Nonetheless, *Dupuy* and its progeny are extremely relevant to our inquiry: Judge Wisdom's reasoning, in rejecting the argument that the reasonableness of the plaintiff's reliance should not be a part of his cause of action, is equally applicable in this case, where the majority dispenses not with the requirement that the plaintiff's reliance be reasonable, but with the more fundamental requirement that he have relied in the first place.

*ously* decided whether a buyer could rely on a 'fraud on the market' theory as developed in the Second and Ninth Circuits."[5] In an accompanying footnote, the majority cites *Schlick v. Penn-Dixie Cement Corp.*, 507 F.2d 374 (2d Cir. 1974), *cert. denied*, 421 U.S. 976, 95 S.Ct. 1976, 44 L.Ed.2d 467 (1975), and *Blackie v. Barrack*, 524 F.2d 891 (9th Cir. 1975), *cert. denied*, 429 U.S. 816, 97 S.Ct. 57, 50 L.Ed.2d 75 (1976). *Schlick* is not a "fraud on the market" case in the usual sense of that term, but as discussed below in part II–C, it represents another sort of modification to the reliance requirement. *Blackie*, however, is the seminal and best known of the "fraud on the market" cases. Earlier, in part IV of its opinion, the majority cites *Blackie* for the proposition that Bishop's "lack of reliance on the Offering Circular, only one component of the overall scheme, is not determinative."[6] The inference is that the majority believes that *Blackie* and the other "fraud on the market" cases support its holding in the case at bar.

*Blackie* is typical of the "fraud on the market" cases in that it involved an extremely large class of plaintiffs who purchased the securities of an issuer at different times over an extended period. The gravamen of the claims of all members of the putative class was the alleged misrepresentation by the issuer of its true financial condition in annual and interim reports, press releases, and SEC filings. One ground upon which the defendants resisted the named plaintiffs' motion for class certification was that the need for direct proof of subjective reliance by each class member would inevitably create sufficient conflicts between class members and the named plaintiffs as to make the named plaintiffs' representation inadequate.

The Ninth Circuit recognized that it was virtually impossible in the context of class-wide proceedings for each class member to present direct proof of his subjective reliance.[7] The court therefore established a rebuttable presumption for those cases alleging deception that inflated the price of stock traded on the open market:

> [P]roof of subjective reliance on particular misrepresentations is unnecessary to establish a 10b–5 claim for a deception inflating the price of stock traded in the open market. Proof of reliance is adduced to demonstrate the causal connection between the defendant's wrongdoing and the plaintiff's loss. We think causation is adequately established in the impersonal stock exchange context by proof of purchase and of the materiality of misrepresentations, without direct proof of reliance. Materiality circumstantially establishes the reliance of some market traders and hence the inflation in the stock price—when the purchase is made the causational chain between defendant's conduct and plaintiff's loss is sufficiently established to make out a prima facie case.

*Id.* at 906 (citations omitted). Drawing upon a distinction made by the Second Circuit in *Schlick* between "loss causation" and "transaction causation," the Ninth Circuit specifically rejected the notion that a Rule 10b–5 action can be predicated solely on a showing of loss causation:

> The 10b–5 action remains compensatory; it is not predicated solely on a showing of economic damage (loss causation). We merely recognize that individual "transactional causation" can in these circumstances be inferred from the materiality of the misrepresentation, *see Tucker v. Arthur Andersen & Co.*, [67 F.R.D. 468, 480 (S.D.N.Y.1975)]; *Schlick v. Penn-Dixie Cement Corp.*, 507 F.2d 374, 381–382 (2d Cir. 1974), and shift to defendant the burden of disproving a prima facie case of causation. Defendants may do so in at least 2 ways: 1) by disproving materiality

---

5. *Ante*, 647 F.2d at 471 & n.12. *Rifkin* lists a number of "fraud on the market" cases in addition to *Blackie*. *See* 574 F.2d at 263 n.4.

6. *Ante*, 647 F.2d at 469.

7. *Cf. Huddleston v. Herman & MacLean*, 640 F.2d 534, 549 (5th Cir. 1981) ("in a class action, while the materiality element can be established for the class as a whole, reliance, like damages, is a matter of individual proof").

or by proving that, despite materiality, an insufficient number of traders relied to inflate the price; and 2) *by proving that an individual plaintiff purchased despite knowledge of the falsity of a representation, or that he would have, had he known of it.*

*Id.* (footnote omitted; emphasis added).

*Blackie's* significance to the case at bar rests in its holding that despite a presumption of reliance in "fraud on the market" cases, the defendant may still defeat recovery by positive proof of nonreliance. The Ninth Circuit has consistently adhered to this rule. *E. g., Keirnan v. Homeland, Inc.,* 611 F.2d 785, 788–89 (9th Cir. 1980). Thus, *Blackie* provides absolutely no support for the majority's partial abandonment of the reliance requirement.

### C.  The Limited Circumstances in Which Reliance May Be Unnecessary

My own research reveals only one factual situation in which the reliance requirement arguably would be unjustified. That situation was presented in *Schlick v. Penn-Dixie Cement Corp.,* 507 F.2d 374 (2d Cir. 1974), *cert. denied,* 421 U.S. 976, 97 S.Ct. 57, 50 L.Ed.2d 75 (1975)—a case cited by the majority in connection with a distinction between "loss causation" and "transaction causation." [8]

Schlick did not allege fraud resulting in his purchase of a security; instead, he alleged that a fraudulent proxy statement was one step in a scheme that led to the forced liquidation of his security.[9] The Second Circuit noted that this was *not* a typical Rule 10b–5 case:

This is not a case where the 10b–5 claim is based solely upon material omissions or misstatements in the proxy materials. Were it so, concededly there would have to be a showing of both *loss causation*—that the misrepresentations or omissions caused the economic harm—and *transaction causation*—that the violations in question caused the appellant to engage in the transaction in question. The former is demonstrated rather easily by proof of some form of economic damage, here the unfair exchange ratio, which arguably would have been fairer had the basis for valuation been disclosed. Transaction causation requires substantially more.

507 F.2d at 380 (emphasis in original; footnote omitted). The court went on to explain the two ways in which a plaintiff could make a prima facie showing of transaction causation:

In a misrepresentation case, to show transaction causation a plaintiff must demonstrate that he relied on the misrep-

---

**8.**  *Ante,* 647 F.2d at 469.

**9.**  Plaintiff Schlick was a minority shareholder in Continental Steel; defendant Penn-Dixie had become a majority shareholder in Continental and thus had voting control. Schlick alleged that Penn-Dixie, by causing Continental's assets to be used for its own purposes, artificially depressed the market price of Continental stock and inflated the market price of Penn-Dixie stock. Schlick alleged that, as part of a scheme, Penn-Dixie proposed to merge Continental into a Penn-Dixie subsidiary but failed to disclose in the proxy statement issued before the merger the manner in which Penn-Dixie had inflated the value of its shares at the expense of Continental. Penn-Dixie then merged Continental into a subsidiary, with the result that the *minority shareholders in Continental* received an unfairly low exchange ratio. Significantly, Continental's minority shareholders had no power to prevent the merger. Under state law a majority of the outstanding shares was all that was required in order to effect the merger. The exchange of the Continental shares held by Schlick and the other minority shareholders for those of the Penn-Dixie subsidiary was, effectively, a forced sale in which they made no investment decision. Schlick's class action, which was founded upon sections 10(b) and 14(a) of the 1934 Act, and Rules 10b–5 and 14a–9 thereunder, was dismissed by the district court on the ground that it failed to present any allegation of injury which was *caused* by the allegedly false and misleading proxy statement other than that caused by the unfair merger itself. After reviewing the allegations of the complaint and the decision of the district court, the Second Circuit noted that the nature of the fraud alleged in the complaint— engagement in a course of business which operated as a fraud and deceit on the purchasers and holders of Continental stock—was encompassed by clause (3) of Rule 10b–5.

resentations in question when he entered into the transaction which caused him harm.... In an omission or nondisclosure case based upon Rule 10b–5, a plaintiff need not show reliance in order to show transaction causation but must still show that the facts in question were material "in the sense that a reasonable investigator might have considered them important" in making his investment decisions.

*Id.* As an exception to the general proposition that a plaintiff must allege and prove transaction causation to recover under Rule 10b–5, the court carved out a limited exception:

> Under the 10b–5 count, *proof of transaction causation is unnecessary by virtue of the allegations as to the effectuation of a scheme to defraud which includes market manipulation and a merger on preferential terms*, of which the proxy omissions and misrepresentations are only one aspect. Thus appellant need only show loss causation with respect to his claim for relief under 10b–5; [the court below] found and we agree that this has been shown. Here the complaint clearly alleges that, *as a result of the merger, appellant was forced to sell* his Continental shares to Penn-Dixie on the basis of an exchange ratio that reflected adversely the manipulated market value of Continental stock, and that he sustained injury accordingly.

*Id.* at 381 (emphasis added).

*Schlick*, then, did not even arguably fit within clause (2) of Rule 10b–5. The misrepresentations and omissions in the proxy statement did not cause the plaintiff's loss. Instead, the claim involved, to paraphrase the Second Circuit's opinion, a forced sale in which the plaintiff had no opportunity to make an *investment decision* and in which, therefore, the defendants' misrepresentations and omissions in the proxy statement were not the sole mechanism—or even the *key* mechanism—through which the fraudulent scheme was to be accomplished. The object of the scheme was not to induce the minority stockholders to make an erroneous decision based on the misstatements and omissions in the proxy statement, for their decision on the proxy solicitation was irrelevant to the success of the scheme; rather, those misstatements and omissions were part of the alleged plan to cover up the essence of the fraud, which was the manipulation of stock prices to set the scene for an unfair exchange ratio in a forced merger. Transaction causation was irrelevant because the minority shareholders were not called upon to make an investment decision. The specific holding of the *Schlick* case, then, can be summarized as follows: when a plaintiff alleges that he has sustained a loss as the result of a fraudulent scheme to bring about a forced sale of his security, he need not plead or prove transaction causation (including reliance, actual or presumed) because he has made no investment decision to participate in the transaction. *Accord, Crane Co. v. Westinghouse Air Brake Co.,* 419 F.2d 787, 797 (2d Cir. 1969), *cert. denied,* 400 U.S. 822, 91 S.Ct. 41, 27 L.Ed.2d 50 (1970) ("where the success of a fraud does not require an exercise of volition by the plaintiff, but instead requires an exercise of volition by other persons, there need be no showing that the plaintiff himself relied upon the deception"); *Vine v. Beneficial Finance Co.,* 374 F.2d 627, 635 (2d Cir.), *cert. denied,* 389 U.S. 970, 88 S.Ct. 463, 19 L.Ed.2d 460 (1967) ("[w]hatever need there may be to show reliance in other situations [citing *List* and other cases], we regard it as unnecessary in the limited instance when no volitional act is required and the result of a forced sale is exactly that intended by the wrongdoer").

Though the specific holding in *Schlick* obviously is inapplicable given the facts of the case at bar, the portion of the Second Circuit's opinion dealing with loss causation and transaction causation *is* instructive. Ours is a case in which, to quote the majority opinion, "the complaint alleged that the defendants had fabricated a materially misleading Offering Circular in order to induce

the Industrial Revenue Board to issue, and the public to buy, fraudulently marketed bonds." [10] Whether this case is viewed as a misrepresentations case or an omissions case,[11] the named plaintiff and every member of the putative class voluntarily entered into the transaction as the result of an investment decision. If we adhere to *Schlick*, each must show transaction causation—including reliance (actual or presumed) on the offering circular. In this case the existence of reliance has been definitively disproved by Bishop's admission that he did not read or even seek to read the offering circular. And, as the majority opinion correct concludes, presumptive reliance has been rebutted by the same admission.

In short, neither *Schlick, Blackie*, nor any other case cited by the majority supports its holding. In fact, the majority's holding runs contrary to the clear implication of every case from this circuit and others in which the reliance requirement has been considered.

**10.** *Ante*, 647 F.2d at 464 (footnote and bracketed definition of terms omitted).

**11.** In my view, this is primarily a misrepresentations case rather than an omissions case because the defendants undertook to sell the bonds pursuant to an offering circular. *See Huddleston v. Herman & MacLean*, 640 F.2d 534, 548 (5th Cir. 1981) ("'[t]his case, involving alleged misstatements and omissions in a prospectus published pursuant to a public offering, cannot properly be characterized as an omissions case of the type for which the *Affiliated Ute* presumption was fashioned"); *Vervaecke v. Chiles, Heider & Co.*, 578 F.2d 713, 717 n. 2, 718 & n. 4 (8th Cir. 1978).

**12.** Justice Rehnquist's opinion in *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975), emphasizes the importance of weighing competing policy concerns:

[W]e would by no means be understood as suggesting that we are able to divine from the language of § 10(b) the express "intent of Congress" as to the contours of a private cause of action under Rule 10b–5. When we deal with private actions under Rule 10b–5, we deal with a judicial oak which has grown from little more than a legislative acorn. Such growth may be quite consistent with the congressional enactment and with the

## III. REASONS FOR ADHERENCE TO THE RELIANCE REQUIREMENT

### A. The Policy Behind the Reliance Requirement

In the case at bar, the majority holds that nonreliance on the defendants' misrepresentations or omissions is not fatal to some cases brought under clauses (1) and (3) of Rule 10b–5 and creates instead a new sort of reliance requirement for those cases—reliance on the integrity of the marketplace. Other than the majority's interpretation of the policies and the congressional purpose behind the federal securities laws,[12] there is absolutely no support for the majority's holding today in the prior precedent of this or any other court.

In part V of its opinion, the majority correctly states that "[t]he thrust of the arguments against [its] holding is that a recovery in this circumstance is not consonant with the central purpose of the securities laws, which, it is argued, is to provide full disclosure so that investors may make informed investment decisions." [13] The majority then cites phrases from a number of cases [14] for the proposition that "[f]ull dis-

role of the federal judiciary in interpreting it, . . . but it would be disingenuous to suggest that either Congress in 1934 or the Securities and Exchange Commission in 1942 foreordained the present state of the law with respect to Rule 10b–5. It is therefore proper that we consider . . . what may be described as policy considerations when we come to flesh out the portions of the law with respect to which neither the congressional enactment nor the administrative regulations offer conclusive guidance.

*Id.* at 737, 95 S.Ct. at 1926.

**13.** *Ante*, 647 F.2d at 470; MS at 16.

**14.** The complete quote from *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), reads as follows:

The Securities Act of 1933 (1933 Act), 48 Stat. 74, as amended, 15 U.S.C. § 77a *et seq.*, was designed to provide investors with full disclosure of material information concerning public offerings of securities in commerce, to protect investors against fraud and, through the imposition of specified civil liabilities, to promote ethical standards of honesty and fair dealing. See H.R.Rep.No.85, 73d Cong., 1st Sess., 1–5 (1933). The 1934 Act was intended principally to protect investors against manipulation of stock prices through regula-

closure is only one means, albeit a central one, of achieving [the] paramount goals" of the federal securities laws.[15] I disagree.

Although passed largely in response to the paralyzing financial crises of the period, the securities laws enacted by Congress in the 1930s were not intended to create a scheme of investors' insurance or to regulate directly the underlying merits of various investments. Compared to the consumer-oriented legislation of the late 1960s and 1970s, the federal securities laws leave a great many potential "harms" (in the sense of economic losses by individual investors) unremedied. In marked contrast to federal laws in other fields, and to many state "blue sky" securities laws, the federal securities laws are based on the premise that the federal government's role is merely to ensure the free flow of complete and accurate information within the Nation's securities markets; once full disclosure is achieved, individual investors are expected to look out for their own interests. In *Affiliated Ute*, the Supreme Court described the 1934 Act and its companion legislative enactments (including the Securities Act of 1933) as embracing a "fundamental purpose ... to substitute a philosophy of full disclosure for the philosophy of *caveat emptor* and *thus to achieve* a high standard of business ethics in the securities indus-

try." 406 U.S. at 151, 92 S.Ct. at 1471 (citing *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 186, 84 S.Ct. 275, 280, 11 L.Ed.2d 237 (1963)) (second emphasis added). And more recently, in *Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977), the Court noted that it "repeatedly has described the *'fundamental purpose'* of the [1934 Act] as implementing a 'philosophy of full disclosure'; once full and fair disclosure has occurred, the fairness of the terms of the transaction is at most a tangential concern of the statute." *Id.* at 477–78, 97 S.Ct. at 1303 (emphasis added). Thus, the Supreme Court has repeatedly held that the *method* which Congress has chosen to promote a high standard of business ethics in the securities markets is to require full disclosure.

As enforced by private plaintiffs seeking money damages, Rule 10b–5 serves both deterrent and compensatory purposes. These compensatory purposes, however, are not without limits. Although Rule 10b–5 may be thought of as remedial legislation, which should be interpreted "not technically and restrictively, but flexibly to effectuate its remedial purposes," *Affiliated Ute*, 406 U.S. at 151, 92 S.Ct. at 1471, "we are not dealing here with any private right of action created by the express language of § 10(b) or of Rule 10b–5.... We are deal-

---

tion of transactions upon securities exchanges and in over-the-counter markets, and to impose regular reporting requirements on companies whose stock is listed on national securities exchanges. See S.Rep.No. 792, 73d Cong., 2d Sess., 1–5 (1934).

*Id.* at 195, 96 S.Ct. at 1382. Even more informative is the actual language from *Tcherepnin v. Knight*, 389 U.S. 332, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967):

The Securities Exchange Act [of 1934] quite clearly falls into the category of remedial legislation. One of its central purposes is to protect investors *through the requirement of full disclosure by issuers of securities*, and the definition of security in § 3(a)(10) necessarily determines the classes of investments and investors which will receive the Act's protections.

*Id.* at 336, 88 S.Ct. at 553 (emphasis added; footnote omitted). The majority also cites *Shapiro v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 495 F.2d 228 (2d Cir. 1974), but that case says:

As we have stated time and again, the purpose behind Section 10(b) and Rule 10b–5 is to protect the investing public and to secure fair dealing in the securities markets *by promoting full disclosure of inside information so that an informed judgment can be made by all investors who trade in such markets.*

*Id.* at 235 (emphasis added). And in *Herpich v. Wallace*, 430 F.2d 792 (5th Cir. 1970), we described Congress' intent as follows:

In short, *Congress meant to afford investors a reasonable opportunity to make knowing, intelligent decisions regarding their purchases and sales of securities in unmanipulated markets, ...* and the loss resulting in connection with purchases or sales made without benefit of such an opportunity is the type of injury section 10(b) and Rule 10b–5 seek to prevent.

*Id.* at 806 (emphasis added).

**15.** *Ante*, 647 F.2d at 471.

ing with a private cause of action which has been judicially found to exist, and *which will have to be judicially delimited one way or another* unless and until Congress addresses the question." *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 748–49, 95 S.Ct. 1917, 1931, 44 L.Ed.2d 539 (1975) (emphasis added).

This court recognized over a decade ago that in the context of a private suit for damages,

> the sweeping language of Rule 10b–5 creates an almost completely undefined liability. All that the rule requires for its violation is that someone "do something bad" in connection with a purchase or sale of securities. Without further delineation, civil liability is formless, and the area of proscribed activity could become so great that the beneficial aspects of the rule would not warrant the proscription. In recognition of this problem, courts have sought to construct workable limits to liability under section 10(b) and Rule 10b–5 which will accommodate the interests of investors, the business community, and the public generally.

*Herpich v. Wallace*, 430 F.2d 792, 804–05 (5th Cir. 1970) (citations omitted). In an accompanying footnote, *id.* at 805 n.12, we listed the reliance requirement first among the court-made limits on civil liability under Rule 10b–5. Citing our decision in *Herpich*, with approval, the *Blue Chip Stamps* Court shared our "concern that the inexorable broadening of the class of plaintiffs who may sue in this area of the law will ultimately result in more harm than good." 421 U.S. at 747–48, 95 S.Ct. at 1931.

The Supreme Court and this court have recognized that there must be limits in defining the class of persons who may recover under Rule 10b–5. The policy question presented by the case at bar is whether the traditional reliance requirement is a sensible limit in *all* cases in which the plaintiff has made an investment decision. I believe that this question must be answered in the affirmative.

The reliance requirement promotes the objectives of the 1934 Act by precluding recovery to a plaintiff who has made an investment decision by his own lights and without reference to the information promulgated under the disclosure requirements of the federal securities laws. Whether disclosure is viewed as a goal or as a mechanism to achieve a goal, it is crucial to the way in which the federal securities laws function. Just as the threat of litigation and massive liability under Rule 10b–5 is intended to deter fraudulent conduct connected with the purchase or sale of a security, the reliance requirement is intended to encourage investors to base their investment decisions on information required by the securities laws to be disclosed. In short, the federal securities laws are intended to put investors into a position from which they can help themselves by relying upon disclosures that others are obligated to make. This system is not furthered by allowing monetary recovery to those who refuse to look out for themselves. If we say that a plaintiff may recover in some circumstances even though he did not read and rely on the defendants' public disclosures, then no one need pay attention to those disclosures and the method employed by Congress to achieve the objective of the 1934 Act is defeated. Indeed, after reading the offering circular in this case and considering the disclosures about the weak and highly questionable financial position of ASECo that *were* made therein, I am left with the nagging question of whether Bishop would have had a loss if he had read the offering circular, latently defective as it may have been.[16]

---

16. The inadvisability of taking any action that would have the effect of minimizing or eliminating the need to read the offering circular is highlighted by the facts of this case. The offering circular may well have contained the latent material misrepresentations and omissions described at great length and in detail in the plaintiff's second amended complaint. But if the plaintiff or someone acting for the plaintiff (such as the broker from whom he bought the bonds, who is not a defendant in this case) had read the offering circular, the disclosures that are made in the financial statements included therein might very well have warned him of the risk inherent in the bonds and of the calibre of

Apart from the fact that the reliance requirement makes sense in the context of the objectives of the 1934 Act and the method chosen by Congress to achieve those objectives, there is another reason for not eliminating the reliance requirement in a suit under Rule 10b–5. To paraphrase Justice Stewart's opinion in *Aaron v. SEC*, 446 U.S. 680, 689, 100 S.Ct. 1945, 1951, 64 L.Ed.2d 611 (1980), we do not write on a blank slate in determining whether reliance is a necessary element for recovery under section 10(b) and Rule 10b–5. The basic requirements of a cause of action under Rule 10b–5 (which are listed in part III of the majority opinion) have remained largely intact since the Rule was adopted. The

Supreme Court has consistently turned back efforts to eliminate or water down those requirements. *E. g., Santa Fe Industries, Inc. v. Green, supra* (only conduct involving manipulation or deception is reached by section 10(b) or Rule 10b–5; private action under Rule 10b–5 will not lie for mere abuse of fiduciary duty); *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976) (private cause of action for damages will not lie under section 10(b) and Rule 10b–5 in the absence of any allegation of scienter; allegation of negligence insufficient); *Blue Chip Stamps v. Manor Drug Stores, supra* (private damages action under Rule 10b–5 is confined to actual purchasers or sellers of securities).[17] *Cf. Aaron*

the people involved in the transaction pursuant to which the bonds were issued.

The second paragraph of the accountant's report on the financial statements of ASECo, Inc. as of August 31, 1972, reveals on its face that the accompanying financial statements were *not* prepared in accordance with generally accepted accounting principles:

> Investment real estate having a net book value of $473,436.66 is carried on the enclosed balance sheet at $2,420,500, an increase for statement purposes of $1,947,-063.34. One parcel is supported by an appraisal dated October 12, 1971, by a member of the American Institute of Real Estate Appraisers at a value of $2,284,000.

The significance of the increase in the carrying value of the real estate "for statement purposes" in the amount of $1,947,063.34 becomes clear when we turn to the balance sheet, where the net worth of ASECo, Inc. is shown as $2,203,657.33. If we subtract from that net worth the amount wrongly included in it ($1,947,063.34), we are left with a net worth of $256,593.99. If we examine that number more closely, we find that it is based in part on three items (totaling $430,787.05) included in Current Assets under the heading "Advances to Stockholders"—one item in the amount of $176,-091.40 called "Open Notes," a second item in the amount of $54,695.65 called "Used for purchase of corporate shares for company account," and a third item in the amount of $200,000.00 called "Capital Stock subscriptions receivable." The footnote to the "Open Notes" item contains the following piece of information: "Stockholders propose to liquidate a portion of these advances by assigning to the corporation their equity in residence real estate, valued at $77,000.00." The footnote to the "Used for purchase of corporate shares for company account" item contains this description of the transaction involved: "The stockholders obtained funds for the purpose of pur-

chasing certain common stocks for the account of the company. We were advised that the shares have been forwarded to the registrars for registration in the company's name." Finally, the footnote to the "Capital Stock subscriptions receivable" item contains the following information: "The company is holding a note from J. C. Harrelson in which he has promised to purchase 1667 shares of capital stock in the company within sixty days of August 31, 1972."

All three of the items listed in current assets under the heading "Advances to Stockholders" would have to be viewed with *great* skepticism, particularly in view of their materiality, individually and in the aggregate, to the financial statements. And, if they are eliminated from current assets, ASECo, Inc. is insolvent.

In summary, the accountant's report included in the offering circular is irregular on its face; the financial statements included therein are highly questionable on their face and strongly suggest that ASECo, Inc. was insolvent or nearly so on the balance sheet date. The average investor in industrial revenue bonds, when presented with the accountant's report and financial statements for ASECo, Inc. would, in my view, have had a good indication that the entire transaction was questionable and extremely risky.

**17.** Indeed, of late the Court has shown marked reluctance to extend the contours of private causes of action under the securities laws generally. *E. g., Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979) (no implied private right of action under § 206 of Investment Advisers Act of 1940); *Touche Ross & Co. v. Redington*, 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979) (no implied private right of action under § 17(a) of 1934 Act); *Piper v. Chris-Craft Industries, Inc.*, 430 U.S. 1, 97 S.Ct. 926, 51 L.Ed.2d 124

*v. SEC, supra* (SEC is required to establish scienter as an element of a civil enforcement action to enjoin violations of section 10(b) and Rule 10b–5); *Chiarella v. United States*, 445 U.S. 222, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980) (recognizing that while silence in connection with purchase or sale of securities may operate as a fraud actionable under Rule 10b–5(1) and (3), criminal liability must be premised on duty to disclose arising from relationship of trust and confidence between parties to a transaction). We do not have a license to do what the Supreme court has refused to do.

*B. The Majority's "Fraud on a Broader Scale" Exception to the Reliance Requirement*

The majority opinion contains two conflicting views of the nature of this case. The opening lines of the majority opinion describe the plaintiff's complaint as alleging "in essence . . . that the defendants had fabricated a materially misleading Offering Circular in order to induce the Industrial Development Board . . . to issue, and the public to buy, fraudulently marketed bonds." [18] But elsewhere in the opinion, the offering circular is described as "only one component of the overall scheme." [19] Following the latter view of the case, the majority opinion states that "[w]henever the rule 10b–5 issue shifts from misrepresentation or omission in a document to fraud on a broader scale, the search for causation must shift also. The 'reliance' that produces causation in the latter type of case cannot come from reading a document. It may arise from . . . a claim by a bond buyer that he relied on the market to provide securities that were not fraudulently created. . . ." [20]

The conflicts in the majority opinion suggest the question: What kind of a case do we really have here?

The answer to that question is clear to me. The majority opinion had it right the first time. We have a case in which the fraud on the plaintiff and the other purchasers of the bonds was effected by means of a misleading offering circular. The defendants are the participants in that offering—the underwriters who sold the bonds, the lawyers who participated in the preparation of the offering circular, the accounting firm that rendered a report on the financial statements included in the offering circular, the bank that acted as a trustee under the mortgage securing the bonds, and various persons who are alleged to have aided and abetted the issuer of the bonds and controlling persons of the issuer. While the plaintiff's second amended complaint chronicles at length and in detail the manner in which the proceeds of the bonds were allegedly dissipated or diverted, the essence of the fraud insofar as the plaintiff and other bond purchasers are concerned consisted of the sale of bonds to the public by means of a misleading offering circular. The "shift" in the Rule 10b–5 issue described in the majority opinion to "fraud on a broader scale" is a shift effected by the majority in order to avoid the result otherwise mandated by the application to this case of the traditional elements of a private cause of action under Rule 10b–5. The majority's only justification for the shift is that Bishop's complaint, like all Rule 10b–5 complaints, tracks the language of the entire Rule and urges the applicability of clauses (1) and (3).[21]

---

(1977) (no implied private right of action under § 14(e) of 1934 Act; unsuccessful tender offeror lacked standing to sue for damages under Rule 10b–6); *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976) (rejecting Seventh Circuit's expansive definition of materiality in private suits under Rule 14a–9 as encompassing "all facts which a reasonable investor *might* consider important"; misstatement or omission in proxy solicitation is material only if there is "substantial likelihood" that a reasonable shareholder *would* (not

"might") consider the fact important in deciding how to vote).

18. *Ante*, 647 F.2d at 464.

19. *Ante*, 647 F.2d at 469.

20. *Ante*, 647 F.2d at 472.

21. It does not appear that Bishop argued any of the majority's theories—his entitlement to rely on the integrity of the market, the bonds' lack of entitlement to be marketed, or the fraud on a

The majority correctly makes the point that the Rule is not limited to a narrow right to recover for knowing fraudulent misrepresentations or omissions in disclosure documents. It goes on to say that the Rule (meaning, presumably, clauses (1) and (3) of the Rule) is "recognized" to provide the basis for a federal cause of action for "fraud on a broader scale" or "more elaborate, intentional schemes which deceive or defraud purchasers of securities."[22] That statement is wrong. No other court has applied clause (1) or (3) of the Rule on the basis of the scale or elaborateness of the scheme to defraud. As the very cases cited by the majority demonstrate, clauses (1) and (3) of the Rule have been applied instead to cases in which the fraud is not covered by clause (2) of the Rule—*i. e.*, to total omissions cases, such as *Ute*, or to cases, such as *Schlick*, in which the fraud is accomplished by means of what the defendants did (*e. g.*, manipulated the market) rather than by means of what they said.[23]

To permit the plaintiff in a case clearly covered by clause (2) of the Rule to fall back on the broad language of clause (1) (which reaches schemes to defraud) or clause (3) (which reaches acts that operate as a fraud), in combination with allegations of elaborate collateral conduct, in order to obviate the effect of the failure to comply with the reliance requirement under clause (2), makes the reliance requirement of clause (2) a dead letter in the one situation in which it most typically applies—the offering of a security, pursuant to an offering circular, to investors who are called upon to make routine investment decisions. The majority notes in footnote 5 of its opinion that to do away with the reliance requirement in a Rule 10b–5(2) case could establish a scheme of investors' insurance, which numerous courts have held was not the intent of section 10(b). Yet, given the scienter requirement, it is difficult to conceive of conduct actionable under clause (2) of Rule 10b–5 that is not also actionable under the broader language of clauses (1) and (3). The majority's holding threatens to turn all of Rule 10b–5 into a scheme of investor's insurance—at least where the security offered can be shown to be not "entitled to be marketed"—and it does so in what is, insofar as the plaintiff is concerned, an ordinary transaction flowing from his voluntary investment decision to purchase a security.

In my view, clauses (1) and (3) of the Rule were drafted broadly so as to reach fraudulent behavior by defendants that is not covered by the literal language of clause (2). But clauses (1) and (3) should not be used, as they are by the majority, to obviate for a plaintiff any of the traditional proof requirements of a cause of action under clause (2).

The majority opinion is a harbinger of difficulties for future securities litigation. Surely ingenious plaintiffs' counsel will hereafter plead the "entitled to be marketed/fraud on a broader scale" theory at least as an alternative basis for recovery. The question whether a security was "entitled to be marketed," *i. e.*, whether the

---

broader scale—in the district court. These theories are not mentioned at all in the district court's memorandum opinion.

**22.** *Ante*, 647 F.2d at 472.

**23.** One leading commentary on the securities laws suggests that a distinction should be drawn between those situations in which the defendants themselves did something to the plaintiff and those situations in which the defendants induced the plaintiff to do something by means of a misrepresentation or omission of a material fact:

> Where the gravamen of the action is something other than misrepresentation or non-disclosure, then of course the question of reliance does not arise. For example, if the

complaint is that the defendant sold $5,000,-000 of securities belonging to the corporation and pocketed the proceeds, or used them to pay for a controlling block of the corporation's stock, as in [*Superintendent of Insurance v. Bankers Life & Casualty Co.*, 404 U.S. 6, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971)], it makes no sense to ask whether anyone relied upon anything. *The complaint is about what the defendant did, not what he said or didn't say.*

R. Jennings & H. Marsh, Securities Regulation: Cases and Materials 1064 (4th ed. 1977) (emphasis added). This distinction is in accord with my discussion of the *Schlick* case in part II–C above.

security, absent the fraud, could have been sold at some price, and the question whether the scale of the fraud was broad enough, are both presumably questions of fact, not readily disposed of by summary judgment. The creation of this new recovery theory will not only breed more litigation, but it will also make that litigation more difficult and time consuming. Whether the end result will be any different can be determined only by seers.

The length to which the majority goes to preserve a remedy in federal court for Bishop suggests that Bishop and others like him who did not rely on the offering circular might otherwise be without a remedy. In fact, if what he alleges in his complaint is true, Bishop had a remedy under Rule 10b–5 against his broker, upon whom he did rely and who advised him that the bonds were a good investment. He chose, for reasons known only to him, not to sue his broker. Surely his election not to sue the person against whom he had a legitimate Rule 10b–5 claim and instead to sue those against whom recovery under Rule 10b–5 has heretofore been precluded should not result in this court's fashioning new law for his benefit. Further, the scheme to defraud that Bishop describes clearly constitutes common law conversion and would be actionable in state court. There is, therefore, no necessity in this case to create a new route to recovery under Rule 10b–5 in order to provide a remedy in federal court for Bishop and others like him who, by their own actions, have forfeited the protection of the Rule.

For the foregoing reasons, I would affirm the decision of the district court granting summary judgment in favor of the defendants.