**Boyd and Ruby EDGINGTON, individually and as representatives of the class of all others similarly situated, Plaintiffs,**

v.

**R.G. DICKINSON AND CO., Gerald Riedl, and First Securities of Kansas Co., Inc., Defendants.**

**No. 90–1274–C.**

United States District Court, D. Kansas.

Oct. 3, 1991.

James T. McIntyre, McMaster & McMaster, Wichita, Kan., for plaintiffs.

Lee H. Woodard, Woodard, Blaylock, Hernandez, Pilgreen & Roth, Wichita, Kan., for defendant R.G. Dickinson & Gerald Riedl.

David E. Bengtson, Robert J. O'Connor, Hershberger, Patterson, Jones & Roth, Wichita, Kan., for defendant First Securities of Kansas.

## MEMORANDUM AND ORDER

CROW, District Judge.

The case comes before the court on the plaintiffs' motion to certify their class action as maintainable pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure. (Dk. 20). After this motion was filed, the parties conducted discovery on the issues relevant to class certification. Among those deposed were the class representatives. The parties then filed with the court their respective positions on the motion to certify. No request for an evidentiary hearing on the motion has been made, and the court believes one unnecessary as the parties have presented a sufficient record through the attachments to their briefs. The parties' arguments are also fully and adequately presented in writing thereby obviating any need for oral argument.

Plaintiffs, Boyd and Ruby Edgington ("Edgingtons"), allege securities violations of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10(b)(5) promulgated thereunder, 17 C.F.R. 240.10b-5; of the Securities Act of 1933; of the Kansas Securities Act; and allege an action under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961 *et seq.;* and other common law actions.[1] All of plaintiffs' claims stem from their purchase of City of Wichita, Kansas, Industrial Revenue Bonds, Series III, 1988 ("Series III").

## FACTUAL BACKGROUND

In May of 1985, the Edgingtons purchased $15,000 worth of City of Wichita, Kansas, Industrial Revenue Bonds, Series XI, 1984 (Series XI) through defendants Gerald Riedl ("Riedl") and R.G. Dickinson and Co. ("Dickinson"). The Series XI bonds paid annual interest at the rate of 11%. Dickinson was the underwriter of the Series XI issue. The proceeds from the Series XI bonds were used to renovate the Market Centre building in downtown Wichita, Kansas. Plaintiffs testified in their deposition that they purchased the Series XI bonds on Riedl's verbal recommendation. In June of 1985 and November of 1987, plaintiffs purchased additional amounts of Series XI bonds bringing their total ownership of these bonds to $30,050.

In November of 1985, plaintiffs purchased $20,000 worth of City of Wichita, Kansas, Industrial Revenue Bonds, Series XIX, 1985 ("Parking Garage Bonds"). Dickinson was also the underwriter of this issue. The proceeds were used to construct a parking garage for the tenants in the Market Centre building.

On April 14, 1988, Kim Barthelme, a Dickinson employee, wrote a letter to the plaintiffs and other holders of the Series XI bonds announcing that these bonds "are being called as of 6-1-88...." The letter instructed bondholders to deliver the bonds to Dickinson before this call date. The letter also said that a flier on the new issue of bonds, Series III, was enclosed, and that should the bondholder desire "to purchase the new issue with the proceeds of your called bond, subject to your approval of the prospectus," this could be accomplished by a call to Dickinson. The enclosed flier was

---

1. The plaintiffs' complaint fails to break down their causes of actions into separate counts and to refer with sufficient particularity to the specific statutes allegedly violated on their claims under the 1933 Securities Act, RICO, and the Kansas Securities Act. The court also sees nothing preventing the plaintiff from also fully pleading any common law actions. These comments should not be construed as a ruling on the sufficiency of the plaintiffs' pleading or as an order giving leave to plaintiffs to file an amended complaint. The court simply is pointing out the reasons for its difficulty in discerning the legal and factual grounds to plaintiffs' claims.

titled, "New Issue Announcement." The letter concluded with the statement by Barthelme: "I anticipate the new issue will be oversubscribed by Tuesday April 19, 1988."

Plaintiffs' deposition testimony concerning their receipt and reading of this letter changed over the six days that their joint deposition was taken. First, they could not recall receiving the letter. Days later, they said the letter was received after they paid for the bonds. The next day, they said the letter was received within two days of its date or sometime before they paid for the bonds. When asked if they relied on the letter in deciding to purchase the new issue Series III bonds, plaintiffs said: "Well, I imagine it did. I wouldn't say for sure because I don't remember."

Sometime after April 14th and before April 25th, plaintiffs had at least two conversations with Dickinson representatives. Plaintiffs recalled that one of the conversations was with Riedl who advised them that the Series III issuance depended on a certain number of Series XI bondholders using their proceeds to buy Series III, that the Series III bonds paid a lower interest rate than the Series XI bonds, and that the Series III bonds were the best investment for their proceeds from Series XI bond call.

On April 25, 1988, plaintiffs placed their order for the purchase of the Series III bonds in the amount of $30,000. In securities parlance, this is the trade date. These bonds paid annual interest at a 9% rate which is lower than the 11% rate paid on the Series XI bonds. The underwriters for the new issue were Dickinson and First Securities Co. of Kansas, Inc. ("First Securities"). The proceeds from the Series III issuance were used to call the Series XI bonds. Plaintiffs paid for their bonds on May 31, 1988, which is termed the settlement date.

Towards the end of May 1986, all purchasers of Series III bonds were sent an Official Statement concerning this issuance. Plaintiffs' position on when, if ever, they received this Official Statement is less than clear. At one point in their deposition, plaintiffs candidly admitted that they could not remember ever getting the Official Statement. Only twenty pages later in their deposition, plaintiffs said they were unsure but believed the Official Statement was received before the settlement date. But later in their deposition, plaintiffs became adamant that they did not receive the Official Statement until more than a month after the settlement date. In contrast, at paragraph eighteen of their complaint, plaintiffs allege the Official Statement was provided to them before their purchase of the Series III Bonds.

During their deposition, plaintiffs recalled reading the Official Statement but could not remember when they did. Plaintiffs conceded their decision to buy the Series III bonds was based on what Riedl had advised them since they could not remember receiving, reading and relying on the New Issue Announcement or the Official Statement. While acknowledging their ignorance of certain risks disclosed in the Official Statement, plaintiffs admitted that had they been aware of those risks at the time they would not have purchased the Series III bonds.

Boyd Edgington is 81 years old and Ruby Edgington is 80 years old. Boyd describes his health as not very good because of his heart problems. Boyd's condition requires him to avoid stressful situations. Boyd believes testifying in a courtroom would be a stressful circumstance. Ruby is still recovering from a hip replacement surgery performed over two years ago. She finds it difficult to sit for extended periods of time. Plaintiffs do not dispute that "[i]t would be very, very difficult" for them to sit through an entire day in the courtroom if this case were to go to trial. Boyd further attributes to his age the fact that his "memory is awful short right now."

## GENERAL LAW ON CLASS ACTIONS

In their amended complaints, plaintiffs allege a class action is properly maintainable under Rules 23(b)(1) and (b)(3) of the Federal Rules of Civil Procedure.[2] Plain-

---

**2.** Plaintiffs' motion only seeks to have the court determine whether a class action is maintaina-

tiffs define the class as "all those who purchased City of Wichita, Kansas, Industrial Revenue Bonds, Series III, 1988 (Market Centre Limited Partnership–Tenant, date May 1, 1988) pursuant to an official statement dated May 31, 1988."

■ A class action is a unique procedural device designed for those peculiar circumstances where factual and legal issues are common to a class. *General Telephone Co. of Southwest v. Falcon,* 457 U.S. 147, 155, 102 S.Ct. 2364, 2369, 72 L.Ed.2d 740 (1982). The principal reason for a class action is the saving in resources that it offers for both the parties and the courts. *Id.* Securities claims are particularly well suited for class actions because they allow for the policies behind the securities laws to be enforced in circumstances where there are numerous investors with small individual claims that otherwise would be effectively barred from litigation. *See Eisenberg v. Gagnon,* 766 F.2d 770, 785 (3rd Cir.), *cert. denied,* 474 U.S. 946, 106 S.Ct. 342, 88 L.Ed.2d 290 (1985); 7B Charles A. Wright, et al., *Federal Practice and Procedure* § 1781 at 28 (1986).

■ Faced with a motion to certify, the court must discern what common legal and factual issues lie at the heart of the dispute. *Sollenbarger v. Mountain States Tel. & Tel. Co.,* 121 F.R.D. 417, 422 (D.N.M.1988). "[T]he class determination generally involves considerations that are 'enmeshed in the factual and legal issues comprising the plaintiff's cause of action.'" *Coopers & Lybrand v. Livesay,* 437 U.S. 463, 469, 98 S.Ct. 2454, 2458, 57 L.Ed.2d 351 (1978) (quoting *Mercantile Nat. Bank v. Langdeau,* 371 U.S. 555, 558, 83 S.Ct. 520, 522, 9 L.Ed.2d 523 (1963)).[3] At the same time, Rule 23 does not authorize a court to inquire into the merits of a suit or to permit any such inquiry to influence its decision on certification. *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177, 94 S.Ct.

2140, 2152, 40 L.Ed.2d 732 (1974). Instead, the court must be content to conduct a "rigorous analysis" of whether the proposed class action satisfies the prerequisites of Rule 23. *Falcon,* 457 U.S. at 161, 102 S.Ct. at 2372.

■ The certification of a class action rests in the district court's sound discretion. *Anderson v. City of Albuquerque,* 690 F.2d 796, 799 (10th Cir.1982); *Olenhouse v. Commodity Credit Corp.,* 136 F.R.D. 672, 679 (D.Kan.1991). The decision necessarily entails weighing the practical and prudential considerations raised by the facts unique to each case. *Reed v. Bowen,* 849 F.2d 1307, 1309 (10th Cir.1988). In making the decision, the courts have erred in favor of certification since the decision is not set in stone, but is subject to later modification. *Esplin v. Hirschi,* 402 F.2d 94, 99 (10th Cir.1968), *cert. denied,* 394 U.S. 928, 89 S.Ct. 1194, 22 L.Ed.2d 459 (1969).

■ Plaintiffs have the burden to show the requirements of Rule 23 are satisfied. *Rex v. Owens ex rel. Oklahoma,* 585 F.2d 432, 435 (10th Cir.1978). The first threshold is the prerequisites of Rule 23(a):

> One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

These four prerequisites are commonly referred to as numerosity, commonality, typicality, and adequacy of representation. The second threshold is the proper placement into one of the three categories in Rule 23(b). Plaintiffs here assert a class

---

ble under Rule 23(b)(3). Plaintiffs' memoranda in support (Dk. 21) and in reply (Dk. 58) address only (b)(3) certification. For these reasons, the court will not consider (b)(1) certification.

3. In a footnote to this sentence, the Supreme Court quotes a passage from a leading treatise explaining the necessity for the court to evaluate many questions involved with the merits of the case and how this connection with the merits is even more significant where (b)(3) certification is sought. 437 U.S. at 469 n. 12, 98 S.Ct. at 2458.

action is maintainable under (b)(3), which provides:

> (3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

With the exception of numerosity, defendants challenge each of the Rule 23(a) prerequisites, as well as, the applicability of Rule (b)(3).

Before embarking on the substantive issues, several preliminary points must be made. The court limits its order to those issues showing that the plaintiffs' proposed class action does not withstand a rigorous analysis. The court will treat the commonality prerequisite as being subsumed within the Rule (b)(3) requirement for predominance of common questions. *See Sollenbarger*, 121 F.R.D. at 423; 7A Charles A. Wright, et al., *Federal Practice and Procedure* § 1763 at 227 (1986). As will be seen, the central issues overlap into each of the relevant prerequisites and the question of predominance. For this reason, the court will reserve its discussion of those issues until all of the requirements and arguments thereunder have been summarized.

### A. *Typicality*

 The class representative's claims must be typical of the putative class's claims. Specifically, the "class representative must be a class member, must have no interest antagonistic to those of the class, and must have suffered the same injury as the other class members." *Grossman v. Waste Management, Inc.*, 100 F.R.D. 781, 788 (N.D.Ill.1984) (citing *Falcon*, 457 U.S. at 156, 102 S.Ct. at 2370). Claims may be typical without being identical. *Olenhouse*, 136 F.R.D. at 680. The representative's claim may differ factually and still be typical of the class if it arises from the same events or course of conduct and shares the same legal or remedial theory. *Dura–Bilt Corp. v. Chase Manhattan Corp.*, 89 F.R.D. 87, 99 (S.D.N.Y.1981); *see also Adamson v. Bowen*, 855 F.2d 668, 676 (10th Cir.1988).

 The requirement of typicality dovetails into the requirement of adequacy of representation. *See Penn v. San Juan Hospital, Inc.*, 528 F.2d 1181, 1189 (10th Cir.1975). Typicality insures that the class representative's claims resemble the class's claims to an extent that adequate representation can be expected. 7A Wright et al., *supra*, § 1764 at 232–33. Consequently, an important part of typicality is the inquiry into whether the representative's interests or claims are antagonistic or adverse to those of the class. *Penn*, 528 F.2d at 1189; *see Olenhouse*, 136 F.R.D. at 680.

Defendants argue the Edgingtons' claims are not typical of the putative class for a number of reasons. The Edgingtons relied exclusively on the oral representations of Riedl in purchasing the Series III bonds, and Edgingtons have not shown that these representations or similar ones were made to other class members. The Edgingtons did not purchase the bonds in reliance on the Official Statement since plaintiffs could not remember receiving it or reading it until after the settlement date. This lack of reliance may even prevent the plaintiffs from being members of the class they have defined as "those who purchased ... [Series III bonds] pursuant to an official statement dated May 31, 1988...."[4] The Edgingtons' claims are

---

**4.** The *Webster's Third New International Dictionary* 1848 (1981) offers these meanings for the phrase, "pursuant to:" "in the course of carrying out; in conformance to or agreement with; according to." "Pursuant to" is typically used to connote some nexus between an action and a

subject to a unique defense based upon their lack of reliance and admission in their deposition that had they known of the risks disclosed in the Official Statement they would not have purchased the Bonds. This admission is also antagonistic to the class's claims of material omissions in the Official Statement, because the disclosures were apparently sufficient to dissuade the Edgingtons from purchasing the bonds. The Edgingtons have testified that around the time the Series III bonds were purchased they had independent knowledge of the declining commercial real estate values in downtown Wichita, Kansas. Finally, the Edgingtons' claims will suffer uniquely from their inability to relate a credible version of the key events.

Edgingtons contend their reliance on ·Riedl and their lack of reliance on the Official Statement are not circumstances which prevent their claims for material omissions and fraud on the market from being typical of the class. Because reliance is presumed under these securities fraud theories, Edgingtons believe their inability to recall certain facts and their inconsistent testimony on the key events will not hurt their claims or those of the class.

### B. *Adequacy of Representation*

 Rule 23(a)(4) requires the class representatives to be in a position to protect fairly and adequately the interests of the class. Courts have broken down the requirement into an evaluation of whether the representative's claims are sufficiently interrelated to and not antagonistic with the class's claims as to ensure fair and adequate representation and whether the representative's counsel is competent. *See Falcon*, 457 U.S. at 157 n. 13, 102 S.Ct. at 2371 n. 13; *Majeski v. Balcor Entertainment Co. Ltd.*, 134 F.R.D. 240, 248 (E.D.Wis.1991); *Smith v. MCI Telecommunications Corp.*, 124 F.R.D. 665, 676 (D.Kan.1989). Both the class representative and his or her attorney must have the means and capacity for vigorous prosecu-

tion of the class action. *Issen v. GSC Enterprises, Inc.*, 522 F.Supp. 390, 404 (N.D.Ill.1981); *Jaurigui v. Arizona Board of Regents*, 82 F.R.D. 64, 65 (D.Ariz.1979). This requirement carries particular significance since inadequate representation would implicate the due process rights of absentee class members bound by the final judgment in the class suit. *Key v. Gillette Co.*, 782 F.2d 5, 7 (1st Cir.1986).

Because the inquiry into antagonistic interests is shared between the typicality and representation requirements, defendants here repeat most of their arguments made on typicality and add a challenge to the personal characteristics of the class representative. Defendants also argue that the Edgingtons cannot adequately represent the class because they are elderly, infirm, and in poor health. Plaintiffs insist their failing health does not interfere with their ability to be class representatives and should not be a reason for denying class certification.

### C. *Predominance of Common Questions*

 Rule 23(b)(3) permits a class action to be maintained when questions of law or fact common to the class members predominate those questions which affect only individual class members. What does it mean for some questions to predominate over other ones and how that is measured are matters not answered in the rule and over which the courts have struggled. It is apparent from the rule that predominance requires more than the mere existence of common questions and that the determination of predominance requires the courts to assess the relationship between the common and individual questions. 7A Charles A. Wright, et al., *supra*, § 1778 at 526–27.

 The question of predominance is answered only after conducting a pragmatic inquiry into whether the central issues of the suit are common to the class. *Sollenbarger*, 121 F.R.D. at 433. The Tenth Circuit's formulation of this inquiry looks for

---

point of reference. As used by plaintiffs in their complaints, "pursuant to" conveys that the purchase of the bonds was made in reference to,

reliance on, or according to the terms of the Official Statement.

"a common nucleus of operative facts" and for "material variations in elements" to the respective claims of the class representative and class members. *Esplin*, 402 F.2d at 99. The Advisory Committee on the 1966 amendments to Rule 23 had this to say about the predominance requirement:

> The court is required to find, as a condition of holding that a class action may be maintained under this subdivision, that the questions common to the class predominate over the questions affecting individual members. It is only where this predominance exists that economies can be achieved by means of the class-action device. In this view, a fraud perpetrated on numerous persons by the use of similar misrepresentations may be an appealing situation for a class action, and it may remain so despite the need, if liability is found, for separate determination of the damages suffered by individuals within the class. On the other hand, although having some common core, a fraud case may be unsuited for treatment as a class action if there was material variation in the representations made or in the kinds or degrees of reliance by the persons to whom they were addressed.

39 F.R.D. 69, 103. Looking at the allegations in the complaint and the discovery to date, the court must discern whether the claims involve a common nucleus of operative facts and whether material variations in the claims exist.

The key factual allegations found in plaintiffs' second amended complaint filed September 9, 1991, reveal that the securities fraud claims are mixed between material omissions and affirmative misrepresentations. Plaintiffs first allege they exchanged their Series XI bonds for Series III bonds based upon the representations of Barthelme and Riedl. (Dk. 76 at ¶ 9).

Plaintiffs do not allege at that point what those representations were or whether they were materially false. As to omissions, it is alleged at paragraphs ten through eleven that the Official Statement fails to disclose that the value of collateral supporting the Series III bonds had been impaired by the deterioration in the commercial real estate market in Wichita, Kansas; that the value of the Parking Garage Bonds had been impaired by the parking garage tenant's failure to pay rent to K.G. & E. for the land; that this rent was being paid from the Parking Garage Bond Reserve account; and that should the Parking Garage Bonds go into default then the value of the Series III bonds would be impaired. At paragraph twelve, plaintiffs allege the underwriters had the duty to conduct a feasibility study rather than simply disclosing that none had been performed. In paragraphs fourteen and fifteen, plaintiffs conclude that "these acts" violate section 10b–5 and the other securities acts. Plaintiffs allege in paragraph seventeen that affirmative misrepresentations of fact appear in the letter signed by Barthelme and dated April 14, 1988. Paragraph eighteen repeats the omissions alleged in paragraphs ten through twelve and adds the claim that defendants Dickinson and Riedl failed to disclose that the Bond Reserve Account for the Series III bonds was substantially less than that for the Series XI bonds. To the best of this court's understanding, these are the factual allegations forming the basis of plaintiffs' securities fraud claims.[5] The complaint goes on to allege that these same affirmative misrepresentations by Barthelme and Riedl are the basis of their claims for common law fraud, breach of fiduciary duty, RICO, and negligence.

Section 10b–5 makes it "unlawful for any person … to use or employ, in connection with the purchase or sale of any security … any manipulative or deceptive device or

---

**5.** Plaintiffs' brief filed in June 24, 1991, contains a number of other allegations of material omissions which for some reason are not found in plaintiffs' second amended complaint filed over two months later. These additional allegations concern the average rental rate per square foot, the actual rental rate for each tenant, the occupancy percentage required for project viability, and the financial condition of the Market Centre Limited Partnership. The court has no basis to consider these additional allegations until they are formally included in plaintiffs' complaint. Obviously, responsive pleadings to motions are not an available avenue for amending answers or complaints.

contrivance in contravention of" SEC rules and regulations. 15 U.S.C. § 78j. SEC Rule 10b–5 provides, in part, that it is unlawful for any person by the means of interstate commerce "to employ any device, scheme, or artifice to defraud, or to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, ..., not misleading ... in connection with the purchase or sale of any security."

■■■ Reliance is an element to all 10b–5 actions. *Basic Inc. v. Levinson*, 485 U.S. 224, 243, 108 S.Ct. 978, 989, 99 L.Ed.2d 194 (1988). Generally, the plaintiff must prove the following elements for a 10b–5 action: "(1) a misstatement or omission, (2) of a material fact, (3) made with scienter, (4) on which the plaintiff relied, (5) that proximately caused his injury." *Ross v. Bank South, N.A.*, 885 F.2d 723, 728 (11th Cir.1989), *cert. denied*, — U.S. —, 110 S.Ct. 1924, 109 L.Ed.2d 287 (1990) (citing *Huddleston v. Herman & MacLean*, 640 F.2d 534, 543 (5th Cir.1981), *rev'd on other grounds*, 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983). Reliance establishes the causal nexus between the misrepresentation and injury. *Levinson* 485 U.S. at 243, 108 S.Ct. at 989. Notwithstanding the elemental role of reliance, the plaintiff need not always prove it. Where the plaintiff shows the defendant breached a duty to disclose material information, plaintiff's reliance on the omission is presumed. *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153–54, 92 S.Ct. 1456, 1472, 31 L.Ed.2d 741 (1972); *Grubb v. Federal Deposit Ins. Corp.*, 868 F.2d 1151, 1163 (10th Cir.1989). This presumption is premised on a plaintiff's difficulty in proving reliance on something that he or she did not know. *Grubb*, 868 F.2d at 1163.

■■■ The presumption of reliance in an omission case is not irrebuttable. *Biechele v. Cedar Point, Inc.*, 747 F.2d 209, 214 (6th Cir.1984). If the defendant proves "that there clearly was no reliance, nondisclosure cannot be said to be the cause of subsequent loss." *Id.; see Buford White Lumber Co. v. Octagon Properties*, 740 F.Supp.

1553, 1566 (W.D.Okla.1989). In other words, if the plaintiffs' conduct would have been the same even with full disclosure, then the failure to disclose cannot be the cause of plaintiff's loss. *Shores v. Sklar*, 647 F.2d 462, 468 (5th Cir.1981), *cert. denied*, 459 U.S. 1102, 103 S.Ct. 722, 74 L.Ed.2d 949 (1983); *see Smith v. Ayres*, 845 F.2d 1360, 1364 (5th Cir.1988); *Lipton v. Documation, Inc.*, 734 F.2d 740, 742 (11th Cir.1984), *cert. denied*, 469 U.S. 1132, 105 S.Ct. 814, 83 L.Ed.2d 807 (1985). The Fifth Circuit has applied this rule in circumstances closely resembling the apparent facts in this case:

Bishop alleged that the Offering Circular contained material misrepresentations and failed to state material facts necessary to make the statements made not misleading. At the same time, he admitted that he never read or otherwise relied on the Offering Circular. If the *Ute* presumption applies to these nondisclosures, Bishop's admission rebuts it. Bishop's claim that he was deceived by the misrepresentations and omissions of the Offering Circular was correctly dismissed by the district court because of his failure to read or even seek to read the Offering Circular.

*Shores*, 647 F.2d at 468. In summary, the fact a plaintiff brings an omission claim does not prevent the defendant from successfully defending against it on the basis of plaintiff's lack of reliance.

■■■ Besides an omission theory, plaintiffs briefly refer to another theory in their memorandum:

Indeed, there is substantial reason to believe that without the pervasive fraud and omissions, this bond issue would never have been issued in the first place. The securities fraud involved in this action in a very real sense created the market for this issue. And a reliance may be presumed pursuant to this theory. The burden of persuasion then shifts from the plaintiff to the defendant on the issue of reliance. (citations omitted).

(Dk. 58 at 14). This argument and the cases cited suggest plaintiffs also believe they are bringing a fraud on the market

theory.[6] As fully appreciated by the plaintiffs, this theory offers the advantage of dispensing with a plaintiff's proof of reliance. *Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718, 722 (11th Cir.1987), *cert. denied*, 485 U.S. 959, 108 S.Ct. 1220, 1221, 99 L.Ed.2d 421 (1988); *Lerner v. Haimsohn*, 126 F.R.D. 64, 67 (D.Colo.1989). A defendant still has available under this theory the affirmative defense that the plaintiff did not rely on the integrity of the market. *Gavron v. Blinder Robinson & Co., Inc.*, 115 F.R.D. 318, 323–24 (E.D.Pa. 1987).

Fraud on the market claims have been recognized in two different contexts: (1) developed securities actively traded in open markets; and (2) newly issued securities traded in an undeveloped market. *See T.J. Raney & Sons v. Fort Cobb, Okl. Irr. Fuel*, 717 F.2d 1330, 1332 (10th Cir.1983), *cert. denied*, 465 U.S. 1026, 104 S.Ct. 1285, 79 L.Ed.2d 687 (1984); *In re Texas Intern. Securities Litigation*, 114 F.R.D. 33, 42 (W.D.Okla.1987). Since the Series III bonds were newly issued, any fraud on the market claim by the plaintiffs would be limited to the second context. In *T.J. Raney & Sons*, the Tenth Circuit adopted the Fifth Circuit's approach in *Shores v. Sklar*, 647 F.2d 462 (1981), allowing a fraud on the market claim for newly issued bonds upon proof of these elements: " '(1) the defendants knowingly conspired to bring securities onto the market which were not entitled to be marketed, intending to defraud purchasers, (2) [the plaintiff] reasonably relied on the Bonds' availability on the market as an indication of their apparent genuineness, and (3) as a result of the scheme to defraud [the plaintiff] suffered a loss.' "

717 F.2d at 1332 (quoting *Shores*, 647 F.2d at 469–70). The Tenth Circuit reasoned that federal and state regulation of new securities should permit purchasers to assume the lawfulness of the issuance. 717 F.2d at 1333.[7] The Tenth Circuit found that plaintiffs were pursuing such claims through their allegations that the defendants knowingly conspired to bring unlawfully issued bonds to market with the intent to defraud, that plaintiff relied on the availability of the bonds as an indication of their lawful issuance, and that plaintiff was injured as a result of purchasing the bonds. 717 F.2d at 1333.[8]

Plaintiffs' second amended complaint does not allege a fraud on the market claim for relief. No allegations are found that plaintiffs relied on the integrity of the market or that the Series III bonds were unlawfully issued or could not have been issued absent some conspiracy of fraud. Consequently, the court will not consider this potential claim in deciding the class certification issues.

As stated above, the defendants' arguments are for the most part the same on the requirements of typicality, adequate representation, and predominance. To summarize, the Edgingtons' claims are subject to the unique defense that they did not read or rely on the Official Statement but purchased the Series III bonds relying exclusively on the oral representations of Riedl. Another defense uniquely available against the Edgingtons arises from their deposition testimony where they admitted that had they known of the risks disclosed in the Official Statement they would not

---

**6.** This single paragraph is the only time the plaintiff refers to the fraud on the market theory. As will be discussed later, the second amended complaint is devoid of any allegations supporting either this theory or the arguments made in this paragraph of plaintiffs' brief.

**7.** The Tenth Circuit was careful not to extend this action beyond those circumstances where the security was not qualified legally to be issued. The court remarked that its holding was not a basis for believing that the regulatory body considers the value of the security or the truthfulness of the statements found in the offering circular. Nor should its holding be inter-

preted as providing a scheme for investors' insurance. 717 F.2d at 1333.

**8.** Courts have read *Shores* as permitting a claim where the issuance of the securities is so tainted by fraudulent representations or omissions that the market failed to screen out these securities. *Ross v. Bank South, N.A.*, 885 F.2d at 729. The alleged fraud is so pervasive that it undermines the reliance a purchaser would place on the fact that the securities are validly present on the market. *Id.* In other words, the bonds could not have been marketed at any price absent the fraud. *Id.*

have purchased the Bonds. This admission conflicts with the basic position taken by the class that the disclosures were insufficient to apprise potential buyers of the risks associated with the bonds.

 The mere existence of individualized questions will not defeat class certification, but when the representatives are subject to unique defenses that predictably will become a major focus of litigation then class certification should be denied. *Gary Plastic Packaging v. Merrill Lynch*, 903 F.2d 176, 180 (2nd Cir.1990), *cert. denied,* — U.S. —, 111 S.Ct. 675, 112 L.Ed.2d 667 (1991); *Koos v. First National Bank*, 496 F.2d 1162, 1164 (7th Cir.1974). It does not matter whether this issue is framed under the requirement of typicality or adequacy of representation for the same danger is addressed—that is, the class representatives will be so preoccupied with their unique defenses that their representation of the class will suffer. *Gary Plastic Packaging*, 903 F.2d at 180; *J.H. Cohn & Co. v. Am. Appraisal Assoc., Inc.*, 628 F.2d 994, 999 (7th Cir.1980). This court must now assess the predictability that a major focus of the case will be a substantial reliance defense against the Edgingtons.

 This is not a case where the court can dismiss the reliance defense as irrelevant or insignificant. Despite the presumption of reliance, the Edgingtons have testified in their deposition that they did not read or rely on the Official Statement in purchasing the Series III bonds. In effect, the Edgingtons must overcome the reasonable inference that even if the Official Statement contained all the representations and facts allegedly omitted they would have still purchased the Series III bonds. The court fully expects the defendants will make the Edgingtons' lack of reliance a major focus of their defense to the Edgingtons' securities fraud claims. In order to prevail on their claim, the Edgingtons will have to confront this affirmative defense. How they will do this and what amount of effort and time will be devoted to this are matters the court cannot predict with accuracy. Nonetheless, the court is quite sure at this point in time that the evidence concerning Edgingtons' lack of reliance on the Official Statement will be a major focus of the defendants' case and will be a critical factor in the Edgingtons' success.

The Edgingtons may also be subject to another unique defense. Among the alleged material omissions is the failure to disclose that the value of collateral supporting the Series III bonds had been impaired by the deterioration in the commercial real estate market in Wichita, Kansas. The Edgingtons testified that they knew real estate values were declining in Wichita, Kansas, at the time they purchased the bonds. Their independent knowledge of this omitted fact will likely be a significant issue in the case.

The Edgingtons' deposition testimony is also antagonistic to the claims of the class. The Edgingtons' candid admission that they would not have purchased the bonds had they read the disclosure of risks in the Official Statement hardly places them in the best position to represent those who decided to purchase the bonds even after reading the disclosure of risks. With the Edgingtons' admission, defendants argue they will be able to show that the risks of this investment were adequately disclosed. Again, the court fully expects that this defense raised through the Edgingtons' testimony will constitute a significant issue in the case.

Plaintiffs have fallen far short of their burden for proving the propriety of class certification on any of their affirmative misrepresentation claims. Plaintiffs have not shown that any of the oral misrepresentations made to them by Riedl upon which they relied were standardized or uniformly made to other class members. *See Glick v. E.F. Hutton & Co., Inc.*, 106 F.R.D. 446, 449 (E.D.Pa.1985); *Seiler v. E.F. Hutton & Co., Inc.*, 102 F.R.D. 880, 888 (D.N.J.1984).

The court has read each of the cases cited by the parties in support of their respective positions on class certification when the representatives are subject to unique reliance defenses. The court also

conducted its own research of the issue. An effort could be made to compare and contrast the relevant points to each case. This seems unnecessary for several reasons. First, the wide variations in rulings and rationales prevent any attempt to distill a meaningful general rule. This is explained in part by the fact that the cases turn upon primarily the particular court's impression of what significance the reliance defense ultimately will have under the unique facts of its case.[9] While the facts in several decisions resemble to some extent those in the present case, the court has not found an omissions case where the class representatives admitted that they had purchased the bonds without relying on the Official Statement, that they had independent knowledge of some facts allegedly omitted from the Official Statement, and that they would not have purchased the bonds had they read the disclosures already found in the Official Statement. The combined weight of these facts convince this court that the Edgingtons' claims are not typical of the class, that the Edgingtons could not adequately represent the class, and that issues unique to the Edgingtons would predominate the issues common with the class.

■ The age and poor health of the Edgingtons raise serious questions concerning their ability to serve as class representatives. Having a fiduciary obligation to the putative class, class representatives must have the character and means to carry out that obligation including the abilities to examine independently the decisions of counsel and to play an active role in the litigation for the protection of the interests of the class. *Jaurigui v. Arizona Bd. of Regents,* 82 F.R.D. at 65. It is difficult to overlook that the Edgingtons have acknowledged how their physical limitations and conditions would significantly affect their role in this litigation. Despite the concessions and conveniences agreed to by the defendants, the Edgingtons' experienced substantial fatigue and discomfort in the taking of their depositions. Also displayed in their depositions was the Edgingtons' difficulty with recalling the critical events and facts surrounding their purchase of the bonds.

Often times, courts have written off challenges to the representatives' health and age by minimizing the role of the representative at trial or by assessing only the adequacy of the representative's attorney. *See, e.g., Moskowitz v. Lopp,* 128 F.R.D. 624, 636 (E.D.Pa.1989); *Garfinkel v. Memory Metals, Inc.,* 695 F.Supp. 1397, 1405 (D.Conn.1988). The court does not believe this practice is appropriate here. Because of the unique defenses against them, the Edgingtons' testimony and involvement in the litigation will be an important aspect of the action. Their lapses in memory and contradictions in testimony pose a serious detraction to the merits of the class action. In addition, this court does not read Rule 23's requirement of an adequate class representative as being met by simply hiring competent counsel. The court believes Rule 23 contemplates that the class representative will be in a position at all times to act in the best interest of the class particularly if that means being able to participate

---

**9.** Plaintiffs cite three decisions in their brief as authority for class certification when the securities fraud claims are based on material omissions, *Harris v. Palm Springs Alpine Estates, Inc.,* 329 F.2d 909 (9th Cir.1964), *Esplin v. Hirschi,* 402 F.2d 94 (10th Cir.1968), and *In re Home–Stake Production Co. Securities, Etc.,* 76 F.R.D. 351 (N.D.Okla.1977). The *Harris* decision involves the pre–1966 version of Rule 23, and its facts and issues are largely different from the instant case. Despite securities claims partially based on varying oral representations and subject to individual questions of reliance, the Tenth Circuit in *Esplin* held the class action was maintainable under (b)(3) because another significant part of the claims was the material omissions which were common to the class and did not invoke separate questions of reliance. 402 F.2d at 99–101. Unlike *Esplin,* the material omission claims of the class representative are not typical of the class because the Edgingtons are subject to a unique reliance defense. In *Home–Stake,* the court did not apprehend the non-reliance issues concerning certain representatives to be "so extensive, complex or time-consuming as to predominate over common factual and legal issues." 76 F.R.D. at 373 (citations omitted). The Edgingtons are the only class representatives thereby increasing the likelihood that the reliance defense will become a central focus of the litigation.

in those critical strategy decisions made at trial. This court has substantial reservations over the Edgingtons' ability to be adequate representatives.

Finally, the court does not find that the Edgingtons are members of the class that is defined in their second amended complaint. The Edgingtons testified that they relied upon the oral representations of Riedl in making their purchase rather than any statements or disclosures found in the Official Statement. Consequently, the court does not understand how the Edgingtons purchased their bonds "pursuant to" the Official Statement.

Since the plaintiffs' claims based on common-law fraud, Kansas Securities laws, and RICO entail the same allegations of omissions and the same defenses unique to the Edgingtons, the court concludes the above reasoning also supports the denial of class certification on these claims. To the extent any of these claims also depend on affirmative misrepresentations, the Edgingtons have not shown any of these misrepresentations to be common to the class.

IT IS THEREFORE ORDERED that the plaintiffs' motion for class action determination (Dk. 20) is denied.